897 A.2d 206

**Danetta GARFINK**

v.

**The CLOISTERS AT CHARLES, INC.**

**No. 79, Sept. Term, 2005.**

Court of Appeals of Maryland.

April 13, 2006.

Reconsideration Denied May 31, 2006.

James E. Carbine (James E. Carbine, P.C., Baltimore, on brief), for petitioner.

John M. Oliveri (Oliveri & Associates, LLC, Annapolis, on brief), for respondent.

Argued before BELL, C.J., WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

CATHELL, J.

This case arises from a dispute concerning the installation of a dryer exhaust vent by Danetta Garfink ("Petitioner") on the exterior of her condominium unit. Petitioner's condominium unit is located in Baltimore County at the condominium regime known as The Cloister's at Charles Condominium ("Condominium"). The Cloisters at Charles, Inc. ("Respondent" or "Council") is a duly organized corporation, serving as the Condominium's council of owners. Petitioner asserts that the Condominium's Declaration gives her the right via an express grant of easement to install the exterior vent. In opposition

to that argument, respondent contends that such installation of an exterior vent is a violation of the Condominium's Bylaws' prohibition against alteration of the exterior facade of the condominium units.

On July 1, 2003, respondent filed a Complaint for Permanent Injunction in the Circuit Court for Baltimore County against petitioner, seeking a court order for removal of the exterior dryer exhaust vent in question. On June 28, 2004, petitioner filed a Motion for Summary Judgment, which was denied. The Circuit Court found in favor of respondent and on August 18, 2004, issued a Memorandum Decision and Order entering a declaratory judgment and a mandatory injunction compelling petitioner to remove the aforementioned exhaust vent. On September 8, 2004, petitioner filed a Notice of Appeal to the Court of Special Appeals. In response, on September 9, 2004, the Circuit Court stayed the injunction pending resolution of the appeal.

The Court of Special Appeals, in an unreported opinion, affirmed the judgment of the Circuit Court. Petitioner filed a petition for writ of certiorari, which we granted. *Garfink v. The Cloisters*, 389 Md. 398, 885 A.2d 823 (2005). We are presented three questions:

"1. Did the Court of Special Appeals err when it ruled that 'traditional easement law' does not apply to easements granted in condominium documents?

"2. Did the Court of Special Appeals err when it affirmed the Trial Court's judgment that the easement contained in the condominium's declaration did not allow Petitioner, without the prior approval of Respondent, to repair a defect in her dryer vent system by relocating the vent to the exterior of her house?

"3. Did the Court of Special Appeals err when it affirmed the Trial Court's judgment that the by-laws of the condominium required Petitioner to obtain the prior approval of Respondent before she could repair a defect in her dryer vent system by relocating the vent to the exterior of her house?"

We find that traditional easement law applies to easements granted in condominium documents and, therefore, the Court of Special Appeals erred in its holding that the easement did not apply. In addition, under the particular factual circumstances extant in this case and due to our resolution in regards to the easement, we find that petitioner was within the bounds of the express grant of the easement to install the exterior dryer exhaust vent without the prior approval of respondent and, under the limited circumstances here present, was not subject to the "prior approval" provision contained within the Condominium's Bylaws and, in any event, because it came under an exception contained in the Bylaws, petitioner's actions did not violate the Bylaws' provisions.

## I. Facts

We quote from the unreported opinion of the Court of Special Appeals:

"[Petitioner] is the owner of a condominium unit at the regime known as The Cloisters at Charles Condominiums, in Baltimore County. [Respondent] is the duly organized corporation which serves as the council of condominium unit owners. As such, [respondent] is obligated to provide maintenance and to enforce the declaration, rules, and regulations of the regime.

"In 1991, [petitioner] purchased her condominium unit [one of the model units] at The Cloisters during the development and construction phase of the project. The original construction included installed household appliances in each unit, a clothes dryer among them. As originally installed, the clothes dryer was connected and vented into the furnace room, rather than to the outside of the building, contrary to the terms of the construction contract, and in violation of prevailing building codes and regulations.[1] The venting

---

1. As stated by the Court of Special Appeals in their footnote 2:

"The parties do not dispute that the original installation was contrary to the local building code, or that the re-venting must be to

system ran from the clothes dryer through the kitchen floor and into the basement furnace room. During the normal operation of the clothes dryer, the vent system would carry and discharge the dryer's exhaust, heat, lint, and moisture into the furnace room. The furnace room contained two furnaces and a hot water heater, each of which were fired by gas burners. This potentially hazardous mixture of elements was extant for approximately nine years.

"In 2000, the clothes dryer fell ill and [petitioner], in response, purchased a replacement from Sears, Roebuck & Co. After viewing the existing vent system, however, Sears refused to install the replacement because a 'fire hazzard [sic] was identified.'

"With the discovery that the vent system posed a fire hazard, and upon refusal of Sears to install the new dryer to that system, [petitioner] took it upon herself to [have] the venting system [re-routed]. The new system was routed from the dryer through the wall of the laundry room into the adjoining garage, then through the garage and through the exterior wall. A standard vent appliance, which discharged the dryer exhaust and lint to the outside, was installed into the exterior of the garage wall. [Petitioner] concedes that she neither sought nor obtained permission of the [respondent] to install the exterior vent.

"In short time, the new venting system created novel problems for [petitioner] and her immediate neighbor, Dr. Oscar Kantt. The new vent was within 17 feet of the front door of Dr. Kantt's residence. Objecting on various grounds to the placement of the vent, Dr. Kantt complained to the [respondent] about the discharge. [Petitioner], Dr. Kantt, and the [respondent] were unable to resolve the matter amicably; consequently, this litigation ensued.

"By virtue of her purchase of the condominium unit, [petitioner] agreed, as did all other purchasers, to the terms

the exterior to comply with the existing code. Therefore, we need not discuss the code requirements in detail."

of the Condominium Declaration and By–Laws.[2]" [Footnote omitted.]

On July 1, 2003, respondent filed a complaint in the Circuit Court for Baltimore County requesting a permanent injunction in which petitioner would be required to immediately remove the exterior dryer exhaust vent and then make an application to respondent for permission to install an exterior dryer exhaust vent.

The absence of an exhaust vent for the dryer resulted from an inherently defective installation of the appliance. The builder apparently simply forgot to install the vent.

The parties conceded that the Baltimore County Building Code [3] requires the venting of clothes dryer exhaust outside of

---

**2.** Article 9 of the Condominium's Declaration states:

"Each owner shall comply with the provisions of this Declaration, the By–Laws and the decisions and resolutions of the Council or its representative, as lawfully amended from time to time and uniformly enforced, and failure to comply with any such provision, decision or resolution, shall be grounds for an action by the Council for damages, foreclosure and/or injunctive relief or any combination thereof, or any other action or relief available at law or in equity."

In addition, Article 12 of the Condominium's Declaration states:

"All present and future owners, tenants and occupants of units shall be subject to and shall comply with, the provisions of this Declaration, the By–Laws and the Rules and Regulations, as they be amended from time to time. The acceptance of a deed of Conveyance or the entering into of a lease ... or the entering into occupancy of any unit shall constitute an agreement between such owner, tenant or occupant and the Council that the provisions of this Declaration, the By–Laws, and the Rules and Regulations as they may be amended from time to time, are accepted and ratified by such owner, tenant or occupant and all of such provisions shall be deemed and taken to be covenants running [with] the land and shall bind any person having at any time any interest or estate in such unit, as though such provisions were recited and stipulated at length in each and every deed or conveyance or lease thereof."

**3.** The Baltimore County Building Code has adopted the standards of the International Building Code, 2000, of which section 1202.4.2 "Contaminants exhausted" states: "Contaminant sources in naturally ventilated spaces shall be removed in accordance with the *International Mechanical Code* and the *International Fire Code*." The International Mechanical Code, 2000, section 504 "Clothes Dryer Exhaust" states in pertinent part:

a building and that, if application were made, respondent would have to authorize the installation of an exterior dryer exhaust vent in some shape or form. The trial court first stayed the proceedings in order to afford an opportunity to the parties to negotiate a resolution. The parties apparently could not agree on the placement of the vent. Some of the suggestions of the respondent would have further violated the building code. On July 28, 2004, after negotiations had failed in reaching an independent resolution, the Circuit Court conducted a one-day trial. As stated, the Circuit Court found in favor of respondent and issued a Memorandum Decision and Order on August 18, 2004. The order stated:

"**ORDERED** that the [respondent's] Motion for Injunctive Relief is GRANTED, to take effect sixty (60) days from the date of this Order and furthermore, until the effective date of said Injunction, [petitioner] may, in compliance with the rules and Bylaws of the condominium, seek approval from [respondent] in order to find a reasonable resolution to the location of the dryer vent."

The Circuit Court based its decision upon an analysis of the Condominium's Declaration and Bylaws and, in the accompanying memorandum decision, discussed its reasoning, stating in pertinent part:

"Viewed as a whole, including the pertinent sections of the Declaration and the Bylaws, they are not in conflict but rather compliment each other. Neither the Declaration nor the Bylaws authorize a unit owner to make any changes to the exterior of the unit such as those made by the [petitioner]. The Court does not interpret the easement contained in section 15.2 of the Declaration to grant a unit owner the right to independently alter the exterior of her unit, especially when the easement is considered along with the prohibition on unapproved exterior alterations expressly

"**504.1  Installation.** Clothes dryers shall be exhausted in accordance with the manufacturer's instructions. Dryer exhaust systems shall be independent of all other systems and shall convey the moisture and any products of combustion to the outside of the building."

identified in the Bylaws. After reviewing the relevant portions of the condominium documents, the Court finds that it was the intention of the Unit Owners to permit individual unit owners to maintain the services to their units in a manner that does not alter the exterior appearance of their unit. In the event that some alterations are necessary, the unit owners must adhere to the proper procedures as outlined in the Bylaws. [Footnote omitted.]

. . .

"[Petitioner] neither notified nor obtained consent from the [respondent] concerning her plans to install a dryer vent on the outside wall of her condominium unit. Upon learning of the unauthorized installation, the [respondent] notified [petitioner] that it did not approve of the vent because of its location and proximity to the front entrance of a neighboring unit. The [respondent] made numerous written demands on the [petitioner] to remove the vent and restore the common elements of the condominium to their original condition. The [petitioner] acted in direct contravention of these demands as well as of the express terms of the Bylaws.

"The [petitioner] suggested that county codes and/or regulations require certain types of dryers to be vented outside. She argues that in order to comply with those regulations she was permitted to install the vent outside. Even if outside ventilation was required, there were other alternatives to the location chosen by the [petitioner]. Even the [petitioner's] experts agreed that the current location of the vent is not the only place where the dryer could be vented. Had the [petitioner] properly sought permission to install the vent and been unreasonably denied, that would have been another issue entirely. However, the [petitioner] never provided the [respondent] with an opportunity to suggest a reasonable solution or alternative to the placement of the vent prior to its installation. Instead, she chose to ignore the procedures governing pre-approval of structural modifi-

cation and took the risk that the [respondent] might [ ] object to her unilateral decision."

On September 8, 2004, petitioner timely noted an appeal to the Court of Special Appeals and on September 9, 2004, the Circuit Court stayed the injunction pending resolution of that appeal. The Court of Special Appeals heard arguments and, on July 22, 2005, filed an unreported opinion affirming the Circuit Court decision.

## II. Standard of Review

The case *sub judice* was tried in the Circuit Court for Baltimore County. Pursuant to Maryland Rule 8–131(c), we review the case on both the law and the evidence. We give due regard to the trial court's judgment of the witnesses' credibility and will not set aside the judgment of the Circuit Court based upon the evidence unless we find it to be clearly erroneous. Md. Rule 8–131(c). As we recently stated in *Gray v. State*, 388 Md. 366, 879 A.2d 1064 (2005):

> "The clearly erroneous standard does not apply to legal conclusions. *Nesbit v. GEICO*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004). 'When the trial court's order "involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." ' *Nesbit*, 382 Md. at 72, 854 A.2d at 883 (quoting *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609, 612 (2002))."

*Gray*, 388 Md. at 374–75, 879 A.2d at 1068. In addition, discussing Maryland Rule 886, predecessor to Rule 8–131(c), the Court found that "it is equally obvious that the 'clearly erroneous' portion of [the] Rule [ ] does not apply to a trial court's determinations of legal questions or conclusions of law based upon findings of fact." *Davis v. Davis*, 280 Md. 119, 124, 372 A.2d 231, 233 (1977) (citing *Clemson v. Butler Aviation–Friendship, Inc.*, 266 Md. 666, 671, 296 A.2d 419, 422 (1972)). The issue of whether traditional easement law applies to condominiums is a question of law, and thus, we review it *de novo*.

**384**

## III. Discussion

In addressing the questions before the Court it is first necessary to review some of the law relative to the condominium form of ownership. The Court in *Ridgely Condominium Association, Inc. v. Smyrnioudis*, 343 Md. 357, 681 A.2d 494 (1996), succinctly described the structure of condominiums:

"A condominium is a 'communal form of estate in property consisting of individually owned units which are supported by collectively held facilities and areas.' *Andrews v. City of Greenbelt*, 293 Md. 69, 71, 441 A.2d 1064 (1982).

The term condominium may be defined generally as a system for providing separate ownership of individual units in multiple-unit developments. In addition to the interest acquired in a particular apartment, each unit owner also is a tenant in common in the underlying fee and in the spaces and building parts used in common by all the unit owners.

4B Richard R. Powell, *Powell on Real Property* ¶ 632.1[4] (1996). A condominium owner, therefore, holds a hybrid property interest consisting of an exclusive ownership of a particular unit or apartment and a tenancy in common with the other co-owners in the common elements.[4] *Andrews,*

---

**4.** "The Maryland Condominium Act defines 'common elements' as all of the condominium except for the units. 'Limited common elements' are those which are 'reserved for the exclusive use of one or more but less than all of the unit owners.' 'General common elements' are those which are not limited. Maryland Code (1996 Repl.Vol.) § 11–101 of the Real Property Article." *Ridgely*, 343 Md. at 359 n. 1, 681 A.2d at 495 n. 1. The 1996 definition of common elements, limited common elements, and general common elements was unchanged throughout the course of the underlying action. *See* Md.Code. (1974, 2003 Repl. Vol.), § 11–101(c) of the Real Property Article.

The Maryland Condominium Act specifies that a " 'Unit' means a three-dimensional space identified as such in the declaration and on the condominium plat and shall include all improvements contained within the space except those excluded in the declaration, the boundaries of which are established in accordance with § 11–103(a)(3) of this title." § 11–101(p). Section 11–103(a) provides the particulars that a declaration must express. Subsection (a)(3) states in pertinent part:

"(3) A general description of each unit, including its perimeters, location, and any other data sufficient to identify it with reasonable

*supra,* 293 Md. at 73–74, 441 A.2d 1064; *see also Starfish Condo. v. Yorkridge Serv.,* 295 Md. 693, 703, 458 A.2d 805 (1983); *Black's Law Dictionary* 295 (6th ed.1990).

"In exchange for the benefits of owning property in

---

certainty. As to condominiums created on or after July 1, 1981, except as provided by the declaration or the plat:

. . .

(ii) If any chute, flue, duct, wire, conduit, or any other fixture lies partially within and partially outside the designated boundaries of a unit, any portion thereof serving only that unit is a part of that unit, and any portion thereof serving more than one unit or any portion of the common elements is a part of the common elements." § 11–103(a)(3)(ii).

The Declaration in the case *sub judice* provides a description of The Cloisters' units in Article 4.1 through 4.4. Article 4.3, pertinent to the case at hand, states:

"Except as otherwise herein provided, each unit shall include the space bounded by and contained within the unit from the division line between that unit and any adjoining unit, as shown on the Condominium Plats, the division line between that unit and any interior common element, as shown on the Condominium plats, and the upper surface of the unfinished structural floor of a unit and the underside of the roof structure above the unit, if such is the case, or the upper unit division line therefore, if any, as shown on the Condominium plats.... *Each unit shall include all of the* heating, *ventilating* and air conditioning machinery, equipment, plumbing and electrical service lines and structural supports, *located within or without, but serving exclusively said unit,* and all of its controls and control wiring, and all supply, return and rain pipes to the point of their connection with their respective common risers.... Unless specifically excluded by the terms of this Article, each unit shall include all improvements, fixtures and installations of every kind and nature whatsoever located within the boundaries of said unit as set forth herein, as well as the improvements, fixtures and installations specifically included by the terms hereof, *whether or not said improvements, fixtures and installations are located within said boundaries.* ..." [Emphasis added.]

The record before the Court does not contain a copy of the Condominium's plat. Accordingly, we have no way of determining with any degree of exactness where the boundary line of this specific unit is in respect to the wall at issue. It appears that the subject wall does not actually abut any structural aspect of the adjoining (and complaining) unit. Other than supporting petitioner's space above the garage, it does not appear that the wall, at the location of the vent, bears any load of other units. Thus, it is possible that the entirety of the wall may be part of petitioner's unit—although without the Condominium's plat we cannot ascertain the situation. Under the specific circumstances here presented, we address the issues as if the wall is a common element.

common, condominium owners agree to be bound by rules [5] governing the administration, maintenance, and use of the property. *Andrews, supra,* 293 Md. at 73, 441 A.2d 1064."

*Ridgely,* 343 Md. at 358–59, 681 A.2d at 495.

The Maryland Condominium Act is codified in Maryland Code (1974, 2003 Repl.Vol.), §§ 11–101 *et seq.* of the Real Property Article.[6] In order to establish a condominium regime, a declaration, bylaws, and condominium plat that are in compliance with Maryland Condominium Act requirements, must be recorded among the land records of the county in which the condominium is to be established. § 11–102(a). It is evident that condominiums are treated like real property, as "[e]ach unit in a condominium has all of the incidents of real property." § 11–106(a). Condominiums shall be governed by a council of unit owners comprised of all unit owners in the condominium. § 11–109(a). In regards to improvements, alterations or additions by the unit owner:

*"Subject to the provisions of the declaration or bylaws* and other provisions of law, a unit owner:

(1) May make any improvements or alterations to his unit that do not impair the structural integrity or mechanical systems or lessen the support of any portion of the condominium;

(2) May not alter, make additions to, or change the appearance of the common elements, or the exterior appearance of a unit or any other portion of the condominium, without permission of the council of unit owners . . . ."

---

5. "The term 'rule' is used . . . in its generic sense to encompass any regulation in any form enacted by a condominium board of directors or council of unit owners, or contained in the condominium's original documents." *Ridgely,* 343 Md. at 359 n. 2, 681 A.2d at 495 n. 2.

6. Hereinafter, except where otherwise indicated, all statutory references are to Md.Code (1974, 2003 Repl.Vol.), §§ 11–101 *et seq.* of the Real Property Article, also known as the Maryland Condominium Act. For a discussion of the legislative history involving the enactment of the Maryland Condominium Act *see Ridgely,* 343 Md. at 360, 681 A.2d at 495–96.

§ 11–115 (emphasis added). Section 11–124 provides guidance towards the harmonization of the various condominium instruments. Subsection (c) states that: "The declaration, bylaws, and condominium plat shall be construed together and shall be deemed to incorporate one another to the extent that any requirement of this title as to the content of one shall be deemed satisfied if the deficiency can be cured by reference to any of the others." § 11–124(c). Subsection (e) provides the hierarchy of the condominium instruments should conflict arise, stating: "If there is any conflict among the provisions of this title, the declaration, condominium plat, bylaws, or rules adopted pursuant to § 11–111 of this title, the provisions of each shall control in the succession listed hereinbefore commencing with 'title'." § 11–124(e).

It is against this backdrop of the Maryland Condominium Act that the questions presented in the case *sub judice* must be addressed.

### A. *Traditional Easement Law Applies to Condominiums*

The Condominium's Declaration states in Article 15.2:

"In addition to any easement established by law, each unit shall have, appurtenant thereto, *an easement in the common elements for the purposes of providing maintenance, support, repair or service for such unit to and for the ducts, pipes, conduits, vents, plumbing, wiring and other utility services to the unit.*" [Emphasis added.]

The Court of Special Appeals, in its unreported opinion, discussed this language, finding that:

"Conversely, however, each such condominium unit must also shoulder the burden associated with that interest, thereby becoming both the servient *and* the dominant estate. This scenario is distinguishable from the traditional concept of easement, whereby one party obtains an easement for his or her benefit and another party must shoulder the obligations associated with that benefit.[7]

---

**7.** This definition does not acknowledge the long standing law of implied negative reciprocal covenants (easements).

"We believe [petitioner's] interpretation to be strained, and that the mutual obligations and benefits of condominium ownership do not call for the application of traditional easement law."

Petitioner contends that the Court of Special Appeals erred in its decision finding that traditional easement law does not apply to condominiums. We agree.

The Court of Special Appeals' reasoning in regards to the treatment of the easement is flawed. The traditional law of easements applies to condominiums. *See* § 11–106(a) ("Each unit in a condominium has *all* of the incidents of real property." (Emphasis added.)); *Ridgely,* 343 Md. at 370, 681 A.2d at 501. Furthermore, the Condominium's Declaration specifically provides in Article 6.1 that "[e]ach unit in the Condominium has *all* the incidents of real property and the owner of a unit shall have such estate therein as may be acquired in real property...." [Emphasis added].

"An easement is the 'nonpossessory interest in the real property of another' and arises through express grant or implication." *Stansbury v. MDR,* 390 Md. 476, 486, 889 A.2d 403, 409 (2006) (citing *Boucher v. Boyer,* 301 Md. 679, 688, 484 A.2d 630, 635 (1984)); *Calvert Joint Venture # 140 v. Snider,* 373 Md. 18, 39, 816 A.2d 854, 866 (2003). As we stated in *Miller v. Kirkpatrick,* 377 Md. 335, 833 A.2d 536 (2003):

"In general, the terms 'easement' and 'right-of-way' are regarded as synonymous. *Chevy Chase Land Co. v. United States,* 355 Md. 110, 126, 733 A.2d 1055, 1063 (1999).

"An express easement by reservation arises when a property owner conveys part of his property to another, but includes language in the conveyance reserving the right to use some part of the transferred land as a right-of-way. *Knotts v. Summit Park Co.,* 146 Md. 234, 239, 126 A. 280, 281–82 (1924). 'In every instance of a private easement—that is, an easement not enjoyed by the public—there exists the characteristic feature of two distinct tenements—one dominant and the other servient.' *Bd. of County Comm'rs of Garrett County v. Bell Atlantic–Md., Inc.,* 346 Md. 160,

175, 695 A.2d 171, 179 (1997). 'Where a right of way is established by reservation, the land remains the property of the owner of the servient estate, and he is entitled to use it for any purpose that does not interfere with the easement.' *Greenwalt v. McCardell*, 178 Md. 132, 136, 12 A.2d 522, 524 (1940) (citation omitted). The generally accepted rule for an express easement is 'that [because] an easement is a restriction upon the rights of the servient property owner, no alteration can be made by the owner of the dominant estate which would increase such restriction except by mutual consent of both parties.' *Reid v. Washington Gas Light Co.*, 232 Md. 545, 548–49, 194 A.2d 636, 638 (1963) (citation omitted)."

*Miller*, 377 Md. at 349, 833 A.2d at 544. There are, however, in contrast to the Court of Special Appeals' opinion, instances in which a dominant and servient estate may *both* benefit and shoulder the burden of a particular covenant or easement. This can occur in the situation of an implied negative reciprocal easement. As we discussed in *McKenrick v. Savings Bank*, 174 Md. 118, 197 A. 580 (1938):

"That one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor

intended that they should affect the land retained as a part of a uniform general scheme of development."

*Id.* at 128, 197 A. at 584–85; *but see Schovee v. Mikolasko,* 356 Md. 93, 107, 737 A.2d 578, 586 (1999) ("In *McKenrick* and in all of the cases before and since, the assertion of an implied reciprocal restriction arising from a general plan of development was premised not on a recorded Declaration defining the land subject to the restrictions or from a recorded plat noting the imposition of restrictions on the lots shown in the plat, but either from the inclusion by a common grantor of uniform restrictions in individual deeds to specific lots or from oral commitments made to purchasers of lots subject to restrictions that subsequent conveyances of retained land would be subject to the same restrictions."). In any case, while not explicitly stated in Maryland case law, we find that reciprocity of benefit and burden can exist between dominant and servient estates.

In the case *sub judice* the language in Article 15.2 of the Condominium's Declaration creates an express easement. An easement is granted to the dominant estate, appurtenant to the individual condominium units (in this case petitioner's unit), "in the common elements," i.e., the exterior of the unit, by the servient estate, the Condominium, "for the purpose of providing maintenance, support, repair or service for such unit and to and for the *ducts,* pipes, conduits, *vents,* plumbing, wiring and other utility services to the unit." [Emphasis added]. This easement was properly established when the Declaration was filed along with the Bylaws and Condominium plat, establishing the Condominium.

The Court of Special Appeals contends that there is an inherent conflict created by such a grant of an easement in the context of a condominium. The court argues that because the individual condominium unit owner is also a member of the Condominium unit owners as a whole, she has an interest in "both the servient *and* dominant estate[s]." In other words, petitioner is granted an easement over or through the common elements as the dominant estate represented by her condominium unit, but as a member of the Condominium she also

has an interest in the servient estate by virtue of her interest in the common elements.[8]  The Court of Special Appeals finds this scenario to be distinguishable from the "traditional concept of easement, whereby one party obtains an easement for his or her benefit and another party must shoulder the obligations associated with that benefit."  We find no conflict in this situation.  While petitioner "can be said to have a tenancy in common in the general common elements with all of the other Condominium unit owners," petitioner owns her individual condominium unit in fee simple.  *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 115, 843 A.2d 865, 870 (2004).  These are two wholly different types of estates.  There is no conflict extant between the two types of ownership in regards to the existence of the express easement.

As such, we reiterate that traditional easement law applies to easements granted in condominium documents, in particular, to the easement granted by the Condominium Declaration in the case *sub judice*.[9]

### B.  *Interpretation of the Express Easement*

Our job now is to interpret what exactly the easement provides for.  In doing this we look to standard constructs of contract interpretation.  The establishment of an easement in a condominium declaration is analogous to the establishment of an easement by deed.[10] We stated in *Miller*:

---

8.  Pursuant to the Maryland Condominium Act, § 11–107(a), petitioner owns an undivided percentage interest in the common elements of the Condominium and can be said to have a tenancy in common in the general common elements, i.e., the exterior of her condominium unit, with all of the other Condominium unit owners.  *See Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 115, 843 A.2d 865, 870 (2004); *supra Ridgely*, 343 Md. at 359, 681 A.2d at 495.

9.  We have not examined, nor will we do so in this case, the application of general easement law to cooperative form of ownership as opposed to condominium form of ownership.

10.  Article 12 of the Condominium's Declaration supports this analogy, stating in pertinent part:

**392**

> "In construing the language of a deed, the basic principles of contract interpretation apply. The grant of an easement by deed is strictly construed. *Buckler v. Davis Sand and Gravel Corp.*, 221 Md. 532, 538, 158 A.2d 319, 323 (1960). The extent of an easement created by an express grant depends upon a proper construction of the conveyance by which the easement was created. *Id.* 'The primary rule for the construction of contracts generally—and the rule is applicable to the construction of a grant of an easement—is that a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible.' *Id.*"

377 Md. at 351, 833 A.2d at 545. We further expounded upon contract interpretation in *Tomran v. Passano*, 391 Md. 1, 891 A.2d 336 (2006):

> "Maryland follows the objective law of contract interpretation and construction. *Owens–Illinois, Inc. v. Cook*, 386 Md. 468, 496, 872 A.2d 969, 985 (2005); *Taylor v. Nations-Bank, N.A.*, 365 Md. 166, 178–79, 776 A.2d 645, 653 (2001); *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001). We have explained:
>
> > A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they

---

"The acceptance of a deed of Conveyance or the entering into of a lease ... or the entering into occupancy of any unit shall constitute an agreement between such owner, tenant or occupant and the Council that the provisions of this Declaration, the By–Laws, and the Rules and Regulations as they may be amended from time to time, are accepted and ratified by such owner, tenant or occupant and *all of such provisions shall be deemed and taken to be covenants running [with] the land and shall bind any person having at any time any interest or estate in such unit, as though such provisions were recited and stipulated at length in each and every deed or conveyance or lease thereof.*" [Emphasis added.]

expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give [way] to what the parties thought that the agreement meant or intended it to mean.

*General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985) (citations omitted). The cardinal rule of contract interpretation is to give effect to the parties' intentions. *Owens–Illinois,* 386 Md. at 497, 872 A.2d at 985."

391 Md. at 13–14, 891 A.2d at 344.

■ The pertinent language of the easement granted by Article 15.2 of the Condominium's Declaration is, as stated *supra:* " . . . each unit shall have, appurtenant thereto, *an easement in the common elements for the purposes of providing maintenance, support, repair or service for such unit to and for the ducts, pipes, conduits, vents, plumbing, wiring and other utility services to the unit."* [Emphasis added]. From this language it is evident that condominium unit owners were to be provided with the ability to perform maintenance, support, repair or service on those items (ducts, pipes, conduits, vents, plumbing, wiring and other utility services) which pierced the "shell" of the unit, passing through the exterior walls or common element spaces. This type of easement is a logical extension of certain rights of individual unit owners. Otherwise, anytime something untoward occurred to one of the above-listed items the unit owner would be required to receive permission from respondent in order to remedy the situation.

The problem that arises in the case of petitioner's exercise of this easement, is that her particular exterior dryer installation was defective because the exhaust had not been properly vented at the time the unit was constructed and at the time of purchase in 1991, nor in fact did it exist when the Declaration establishing the easement was filed. Had a vent existed at

the time the Declaration was filed, petitioner would clearly have an easement to pierce the common element in order to perform maintenance, support, repair or service on a pre-existing vent. In fact, every other condominium unit in the Condominium has such an exterior dryer exhaust vent and each unit's respective owner has an easement to service those vents as provided by Article 15.2 of the Declaration without the necessity of seeking the permission of the Board. The intent of the easement provision of the Declaration was to provide all unit owners with the ability to maintain the essential ducts and vents which run through, or were intended to run through, the common elements that surround their condominium units. It can be assumed that when the Declaration was drafted and the grant of easement made, the drafters believed that the condominium units would be, or had been, built to code and that all ducts, pipes, conduits, vents, plumbing, wiring and other utility services would be, or had been, properly constructed. There appears to be no dispute that a vent was contemplated for the respective unit, but failed to be installed during the construction phase—otherwise building codes and probably fire codes would have been violated. The fact that petitioner's unit was improperly constructed by the developer of The Cloisters does not negate this aspect of the easement. The unit requires an exterior dryer exhaust vent in order to comply with Baltimore County Building Code, *supra,* as the Court of Special Appeals recognized, stating that "if application is made, the Council must authorize the installation of an exterior vent."

■ It was reasonable for petitioner to remedy the hazard created by the improper original construction of the dryer exhaust system. In order to reasonably enjoy the grant of the easement, petitioner was entitled to install an exterior dryer exhaust vent. In support of this, we look to some cases involving right-of-ways.[11]

---

11. As we stated *supra,* "[i]n general, the terms 'easement' and 'right-of-way' are regarded as synonymous." *Miller,* 377 Md. at 349, 833 A.2d

■ It is well established that " '[n]othing passes as incident to such a grant, but that which is necessary for its reasonable and proper enjoyment.' " *Baker v. Frick,* 45 Md. 337, 340 (1876) (quoting 3 *Kent* 419, 420); *Simon Distributing Corp. v. Bay Ridge Civic Ass'n,* 207 Md. 472, 479, 114 A.2d 829, 832–33 (1955); *Everdell v. Carroll,* 25 Md.App. 458, 463–64, 336 A.2d 145, 149–50 (1975). In addition, the *Baker* Court stated:

> "What is necessary for such reasonable and proper enjoyment of the way granted, and the limitations thereby imposed on the use of the land by the proprietor, depends upon the terms of the grant, *the purposes for which it was made, the nature and situation of the property subject to the easement,* and the manner in which it has been used and occupied."

45 Md. at 340 (emphasis added). While *Baker* dealt with the issue of a right-of-way across a servient estate and that servient estate's right to place gates upon the road, the language above is relevant to the case *sub judice.*[12] We look to the intentions of the parties in interpreting the language of the easement and to what is reasonable and necessary for the proper enjoyment of such easement. It was the intention of the parties that existed at the time the Condominium was constructed and the Declaration placed on record that the condominium units be built to fire and building code specifica-

at 544 (citing *Chevy Chase Land Co. v. United States,* 355 Md. 110, 126, 733 A.2d 1055, 1063 (1999)).

**12.** *See also Lyman v. Arnold,* 15 F. Cas 1143, 1144 (Story, Circuit Justice, C.C.D. R.I. 1828) (No. 8,626) (Justice Story, when riding the circuit, wrote for the circuit court, stating: "In the construction of grants, that is doubtless to be adopted, which gives entire and liberal effect to the intention of the parties. When the object is distinctly seen, the ordinary means, by which it is to be attained, are presumed to be within the purview of the parties. If the use of a thing is granted, whatever is necessary for the enjoyment of such use, or for the attainment of such use, is, by implication, granted also. But if it be not necessary, but may be a convenience only, it is not granted. So, too, grants are to be construed according to the subject matter, and the natural presumptions arising from their terms, and thus to render them expositions of rational intentions." (citations omitted)).

tions and therefore, a proper dryer exhaust system was required for the unit at inception—at which point no permission would have been necessary nor would there have been any respondent in existence. This intention is evidenced by the fact that every other one of the forty-seven additional condominium units has such an exterior dryer exhaust vent—the repair of which do not require the permission of the Board. The installation of an exterior dryer exhaust vent is reasonable and necessary, nd was fully contemplated, for the proper, and more importantly, safe, operation of the dryer and its presence and maintenance was fully contemplated by Article 15.2 of the Declaration.[13]

---

**13.** Tiffany's *The Law of Real Property* states:

"The grant of an easement includes, by implication and as an incident thereto, *the right to perform such acts as are reasonably necessary to make the grant effective.* Accordingly, the owner of the easement may enter on the servient tenement and make such changes therein as are necessary for the proper exercise of the easement. Thus, one having a right of way may prepare the land for its exercise, according to the nature of the way, that is, according as it may be a footway, a horseway, or a way for all teams and carriages. He may construct and repair the way, break up and level the soil, fill up depressions, blast rocks, remove impediments and supply deficiencies. So, too, he may change the grade of an easement of way to make it usable and convenient for the purposes for which it was granted, or, where a grantor excepts a spring on the land conveyed and the right of bringing water therefrom to the premises retained, he has the right to do whatever is reasonably necessary to make the right to take the water available. *And he may subsequently make alterations in the servient tenement in so far as this may be necessitated by a change of conditions for which he is not responsible.* He cannot, however, make alterations in the servient tenement, which are not necessary for the exercise of the easement, even though they conduce to the convenience of its exercise, if such alterations will injuriously affect the servient tenement, nor may he so change the surface of the land as to injure seriously or possibly destroy the usefulness of the servient estate. Moreover, it has been stated generally that, while immaterial changes in an easement may be made in a proper case, it may not be substantially enlarged or materially changed so that it will be an increased burden on the servient estate."

3 Herbert T. Tiffany, The Law of Real Property, § 810 (3d ed.1939, 2006 Supp.) (emphasis added) (footnotes omitted). The installation of the exterior vent by petitioner was necessary for the proper exercise of the easement and does not injure or place an undue burden upon the servient estate of the respondent.

Respondent concedes that the easement grants unit owners control over certain systems which run through the common elements of the Condominium, but asserts that the easement does not "serve to grant a unit owner the unfettered right to install a completely new system in an area in which it has previously not been installed." In support of this, respondent contends that such a holding would open and let loose a virtual Pandora's box of monstrosities on the Condominium, stating:

"then any unit owner could install a new gas heating system to replace the old electric heating system and run his new gas lines for same, in, through and around the exterior facade of the unit without seeking the approval of the Respondent. Moreover, any of the forty-seven (47) unit owners could punch holes in the exterior of their condominium unit whenever, wherever, and however they pleased; replace a window with an exhaust fan; install a new heat pump on her parking pad; attach solar panels to the garage door; or attach a satellite dish to her front steps, all without any prior consent of the Respondent."

Respondent's concerns are not valid in this case. The installation of the exterior dryer exhaust vent by petitioner is not something that is new or in addition to the original construction of the other forty-seven condominium units. Every other condominium unit in The Cloisters already has such an exterior dryer exhaust vent system and the owners are able to maintain those systems without the approval of the Board because of the easement granted by Article 15.2 of the Declaration. That venting system is equally essential in order for petitioner's condominium unit to comply with Baltimore County Building Code and is, thus, reasonable and necessary. Our holding does not allow unit owners the unfettered ability to make changes to the exterior of their condominium unit without prior approval by respondent. Rather, it reasonably allows **only** the petitioner, where an obvious construction defect exists relating to safety, to install the exterior vent in reliance on the rights granted by the express easement (and for that matter in exercise of the rights inherent in an exception contained in the Bylaws). It is obvious that the

intention of the drafters of the easement was that in the circumstances described in the easement, the unit owners would have the automatic right to maintain necessary and required venting and ducts without the permission of the Board. We believe that in the unusual circumstances of this case, the situation is the functional equivalent of maintenance necessary for the reasonable and safe operation of the dryer. Our holding is limited, however, to the particular situation here extant.

■ Respondent also argues that the easement language in Article 15.2 of the Declaration must be harmonized with the language in the Article IX of the Bylaws:

### "Architectural Standards

### 1. Architectural Standards Committee.

a. Except for the original construction of the Condominium Units situate within the property by the Developer and any improvements to any Condominium Unit or to the General or Limited Common Elements accomplished concurrently with said original construction, and except for purposes of proper maintenance and repair,[14] or as otherwise in these By–Laws provided, it shall be prohibited to install, erect, attach, apply, paste, hinge, screw, nail, build, alter, remove or construct any light, screens, awnings, patio covers, decorations, fences, aerials, antennas, dishes, radio or television broadcasting or receiving devices, slabs, sidewalks, patios, terraces, balconies, platforms, porches, walls or to make any change or otherwise alter, including any alteration in color, in any manner whatsoever, to the exterior of any Condominium Unit or upon any of the General or Limited Common Elements until the complete plans and specifications prepared at the expense of the Condominium

---

**14.** Petitioner argues extensively in her brief that there is an exception within the Bylaws to the general prohibition against any alteration of a condominium unit's exterior facade. It is petitioner's contention that the language "except for purposes of proper maintenance and repair" provided in Article IX creates such an exception.

Unit Owner proposing the change, showing the location, nature, shape, height, material, color, type of construction and/or other proposed form of change, including, without limitation, any other information specified by the Board (or its designated Committee), shall have been submitted to, and approved or approved with conditions, in writing by the Board, or by an "Architectural Standards Committee" designated by such Board.

b. In the event the Board, or its designated Committee, fails to approve, or disapprove, such design and location within sixty (60) days after said plans and specifications have been submitted to it, approval will not be required and this Article will be deemed to have been fully complied with. If plans and specifications are not submitted, any and all alterations and/or changes shall be deemed violations of this Article."

Respondent asserts that, pursuant to the Maryland Condominium Act, the Declaration and Bylaws should be construed together. *See* § 11–124(c) ("The declaration, bylaws, and condominium plat shall be construed together and shall be deemed to incorporate one another to the extent that any requirement of this title as to the content of one shall be deemed satisfied if the deficiency can be cured by reference to any of the others.").

In support of this contention, respondent cites to a Court of Special Appeals opinion, *Dulaney Towers Maintenance Corp. v. O'Brey*, 46 Md.App. 464, 418 A.2d 1233 (1980), which states: "When a controversy arises as to a resident's right as a unit owner in a condominium, the courts must examine the condominium's enabling statutes for relevant provisions, consider the master deed or declaration, study the bylaws, and attempt to reconcile the three." *Id.* at 465, 418 A.2d at 1235 (citing *Sterling Village Condo., Inc. v. Breitenbach*, 251 So.2d 685 (Fla.App.1971)). Respondent is correct in its assertion that the Court should attempt to reconcile or harmonize the provisions of the Declaration and Bylaws. Both the Declaration and the Bylaws, under the limited circumstances of the present case, provide for the repair of an inherent defect relating

to safety without Board approval, even to the point of providing for venting to the exterior. If, however, they are not so compatible and there is a conflict between the Declaration and the Bylaws that cannot be cured by construing the two pertinent provisions together, then the Declaration would prevail.

The Maryland Condominium Act provides a resolution in the case of such conflict. *See* § 11–124(e) ("If there is any conflict among the provisions of this title, the declaration, condominium plat, bylaws, or rules adopted pursuant to § 11–111 of this title, the provisions of each shall control in the succession listed hereinbefore commencing with 'title'.").[15] In this case, the easement granted in Article 15.2 of the Condominium Declaration, if there were to be a conflict, would control over the language in Article IX of the Bylaws. Respondent further contends that § 11–115(2) of the Real Property Article provides a Title section which controls over the Declaration. This is an erroneous argument. Section 11–115 states:

> *"Subject to the provisions of the declaration* or bylaws and other provisions of law, a unit owner:

> . . .

> (2) May not alter, make additions to, or change the appearance of the common elements, or the exterior appearance of a unit or any other portion of the condominium, without permission of the council of unit owners. . . ." (Emphasis added.)

---

**15.**   In addition, the Bylaws provide in Article XVI 2:

*"Conflict.* These By–Laws are subordinate and subject to all provisions of the Declaration and to the provisions of the Act. All of the terms hereof, except where clearly repugnant to the context, shall have the same meaning as in the Declaration or the Act. In the event of any conflict between these By–Laws and the Declaration, the provision of the Declaration shall control; in the event of any conflict between the By–Laws and the applicable Sections of the Act, the provisions of the Act control."

Though, pursuant to § 11–124(e), title provisions control over the declaration provisions in this case, § 11–115 specifically states that it is "[s]ubject to the provisions of the declaration...." *See also Sea Watch Stores Limited Liability Co. v. Council of Unit Owners of Sea Watch Condo.*, 115 Md.App. 5, 43, 691 A.2d 750, 768 (1997) (discussing § 11–115(3) and holding that "if the condominium documents conflict with the provisions of [the section], the condominium documents control, because the statute is made 'subject' to the condominium documents"). Therefore, if a conflict existed, the Declaration would control in this instance. The easement is valid and applies to the Condominium and is in harmony, *under these limited circumstances*, with the Bylaw provision that permits breach of the exterior walls for repair and maintenance without prior approval of the Board.

C. *The Easement (and the Bylaws Provision), Separately and Together, Allow Petitioner to Install the Dryer Exhaust Vent on the Exterior of her Condominium Unit Without Prior Approval of Respondent Where the Defect They Repaired is an Inherent Initial Defect, Relating to Public Safety, in the Construction of a Unit*

We have consolidated and modified petitioner's second and third questions presented due to their overlap in subject matter. Petitioner contends that the Court of Special Appeals erred in finding that (1) the easement did not allow petitioner to repair the defect in her dryer exhaust system by installing the exterior vent without prior approval by respondent and (2), in concert, that the Condominium's Bylaws specifically require petitioner to obtain such prior approval. We find that the installation of the exterior dryer exhaust vent was necessary to correct an initial construction defect and further, it was necessary for reasonable, proper, and safe use of the unit and therefore petitioner was empowered by the Declaration and Bylaws with the opportunity to repair the inherent defect by installing the venting system without the prior approval of respondent. This repair was of an initial construction defect and, pursuant to the intent of the easement provisions of the

Declaration and the express exception in the Bylaws themselves, prior approval of the Board was not necessary.

Our holding is limited to instances where the inherent problem results from an initial construction defect and where the Condominium Declaration contains an express easement *and* there is a Bylaw exception permitting the repair without prior approval. Furthermore, as our decision relates only to the issue of whether prior approval of the Board was necessary, it does not affect other individual unit owners' rights of recourse if their individual rights are adversely affected.[16] But, the Condominium's Bylaws under the particular facts and circumstances of this case did not require petitioner to obtain prior approval for the installation from the respondent because of the easement granted by the Condominium's Declaration, as well as the Bylaws exception, as discussed *supra.*

### D. *Location of the Exterior Dryer Exhaust Vent*

The Circuit Court and the Court of Special Appeals, along with respondent, state that there were several alternate locations that the exterior vent could have been placed in order that it not interfere with Dr. Kantt's enjoyment of his property. The record, however, does not reflect this. Respondent identifies four alternate locations. The first alternative is running a new dryer exhaust system up though the main furnace duct, which would vent out through a chimney in the roof of the house. This proposal is unacceptable, as it would violate section 504.4 of the International Mechanical Code, 2000, which states that the "[c]lothes dryer exhaust ducts shall not be connected to a vent connector, vent or chimney." The second and third alternatives involved moving the exterior vent from its installed position either "a couple of inches or a couple of feet" or "twelve to sixteen inches." Neither of which is substantially different from where it was originally installed and would not serve to provide a remedy for Dr. Kantt's complaint. The final alternative was given

---

**16.** Traditional actions of nuisance and the like may be available to other individual unit owners, if appropriate.

when respondent's counsel questioned petitioner's expert witness at trial, as outlined in the following colloquy:

"[Counsel:] ... In response to my question whether or not the alternatives that were discussed here were the only alternatives, your response was depends on how much money you want to spend?

[Witness:] Yes.

[Counsel:] Other alternatives exist?

[Witness:] Based on your financial expenditures, yes.

[Counsel:] Right. And now, that directly contradicts what you testified to earlier, that other alternatives didn't exist?

[Witness:] That is true.

[Counsel:] Okay. So now what I need to be able to let the judge know is that some alternatives do exist besides the current placement of the vent. That is what I'm hearing from you?

[Witness:] Yeah. I believe my testimony was that we could move it six to twelve inches. And you asked me, if I heard you right, two things: Number 1, you said I said something out in the hallway that you didn't relate to and then you turn around and said to me that could it be moved and I said if you want to spend a lot of money. It is simple, we tear all the dry wall out of the garage, we tear out and drop the ceiling down and we can move the dryer to the second floor and shorten it up. We can move the dryer anyplace around that there is, move the garage out. If you want to spend the money, pal, give it to me."

It is not a viable alternative to, effectively, completely remodel petitioner's condominium unit by tearing down walls and dropping ceilings in order to be able to provide exterior ventilation for the clothes dryer in a different location. The exhaust system was improperly installed by the developer in the first instance when they had the opportunity to locate the exterior vent wherever would have been most preferable. Petitioner had the vent installed in the most logical place, as evidenced by the Court of Special Appeals' recitation of the facts of the case: "The new system was routed from the dryer

through the wall of the laundry room into the adjoining garage, then through the garage and through the exterior wall." Thus, we find the location of petitioner's original installation of the exterior dryer exhaust vent to be the most reasonable option under the facts presented in the case *sub judice.*

## IV. Conclusion

Article 15.2 of the Condominium's Declaration provides for an express easement and Article IX of the Bylaws provides an exclusion from the requirement of obtaining prior Board approval under the specific circumstances here present. The specific provisions of both documents allow this individual condominium unit owner to repair the inherent construction defect that relates to the safe use of her premises without prior approval. For the aforementioned reasons we reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.**

WILNER, HARRELL, and BATTAGLIA, JJ., Dissent.

Dissenting Opinion by WILNER, J., which HARRELL and BATTAGLIA, JJ., join.

It is often said that hard cases make bad law. Occasionally, a court is faced with a situation in which the normal application of legal principles that are either well-established on their own or that would naturally flow from the objective interpretation of broader common law or statutory mandates will produce a result that the judges of the court feel is unduly harsh, or even unfair, to a litigant. The temptation arises not

to apply those principles as the law would ordinarily require, and the judges, instead, look for some way to create a little bubble, or exception, to avoid the perceived harsh or unfair result. What often happens when they do that, of course, is that the law, itself, becomes less certain, less reliable, and, in the end, less just.

That is what the Court is proposing to do here. The Court believes that Ms. Garfink should be able to dry her clothes without violating the county Fire Code, as indeed she should. To allow her to achieve that objective, however, the Court stretches the scope of an easement well beyond what the plain language of the easement would allow and gives less even than lip service to a clear and critical element of the condominium regime—control over the common elements and building exterior by the council of unit owners.

There are three problems with the Court's approach, apart from ignoring the wisdom of the adage that hard cases make bad law. The first is that, despite its valiant effort to circumscribe its ruling just to this case, the ruling cannot be so neatly cabined. The scope articulated by the Court is ambiguous and, as it attacks critical elements of nearly every residential condominium project and most other developments that are subject to reciprocal restrictive covenants, it will create considerable uncertainty and will likely generate a good bit of litigation in an area that should remain absolutely clear and certain. Second, even if the Court could make the contours of its self-created bubble clear, so that its ruling really is unique to this one situation, the ruling would then be wholly inconsistent with the long and consistent view of this Court that *certiorari* is not to be granted except to consider an issue of public importance, one that is beyond the interest of just the litigants. It is hardly consistent with that notion for this Court to establish a rule applicable only to one unique situation such as this, that has no interest to anyone beyond Ms. Garfink and the council of unit owners of The Cloisters at Charles, Inc. Finally, and perhaps most important, it is unnecessary in this case. One does not have to go through the legal gyrations and gymnastics—the unwarranted stretching of

some legal principles and the sharp contraction of others—in order to permit Ms. Garfink to dry her clothes without violating the county Fire Code.

As the Court notes, Ms. Garfink purchased her unit in 1991. It had been used by the developer as a model unit and apparently had a clothes dryer in it that was included with the sale. Where the dryer was located in the unit is not clear.[1] In the absence of evidence to the contrary, it is a fair inference that the dryer was not intended to be used while the unit served only as a model. Whether for that or some other reason, the dryer was vented into the furnace room and not to the outside. Whether that was a Code violation prior to the sale to Ms. Garfink, it certainly became one when she purchased the unit and began to use the dryer. Use it she did, however, luckily without incident, for about nine years. It was only when the dryer died, the service technician refused to install the new one because of the unlawful venting, and Ms. Garfink decided to deal with the matter by punching a hole in the exterior wall without seeking permission from the council of unit owners did the controversy before us surface.

The Court correctly identifies the relevant statutory, property, and contractual provisions that apply. Maryland Code, § 11–115 of the Real Property Article, which is part of the Maryland Condominium Act, provides that, "[s]ubject to the provisions of the declaration or bylaws and other provisions of law," a unit owner may make improvements or alterations to his or her unit that do not impair the structural integrity or mechanical systems or lessen the support of any portion of the condominium, but may *not* alter, make additions to, or change the appearance *of the common elements, or the exterior appearance of a unit . . . without permission of the council of*

---

1. At oral argument, counsel were asked by the Court whether the record contained floor plans, architectural drawings, or condominium documents indicating where the dryer was in Ms. Garfink's unit and any other units in the development that had dryers similarly situated, as well as how and where those other units' dryers were vented when originally constructed. We were advised that such documents were not in evidence.

*unit owners.* (Emphasis added). Section 11–124(c) requires that the declaration, bylaws, and condominium plat be construed together and be deemed to incorporate one another, *i.e.,* to be read in harmony and not in a manner that would create conflict. Thus, unless the declaration, bylaws, or plat, construed together, dictate otherwise, the *law* requires a unit owner to get permission from the council of unit owners before making any alteration or addition that changes the appearance of a common element or the exterior appearance of a unit.

The pertinent provision in the condominium declaration is § 15.2, which grants an easement to each unit "in the common elements *for the purposes of providing maintenance, support, repair or service* for such unit *to and for the ducts, pipes, conduits, vents, plumbing, wiring and other utility services to the unit.*" (Emphasis supplied). If there are ducts, pipes, conduits, vents, plumbing, wiring, or other utility services serving the unit that intrude upon the common elements, the unit owner may, pursuant to that easement, enter the common elements for the limited purpose of maintaining, supporting, repairing, or servicing those ducts, pipes, conduits, or vents, etc. I see nothing in that easement, however, that permits a unit owner, without approval of the council of unity owners to install *new* ducts, pipes, conduits, vents, plumbing, wiring, or other utility services in the common elements where none previously existed. The Court apparently does—but just for this one case; I do not.

Finally, there is Art. IX of the bylaws which, except for original construction of the units, improvements accomplished concurrently therewith, and "proper maintenance and repair," prohibit unit owners from altering "in any manner whatsoever" the exterior of any condominium unit or any common element without approval of the council of unit owners. That clear, unambiguous provision in the bylaws can be read, and should be read, harmoniously with the easement contained in § 15.2 of the declaration and § 11–115 of the Real Property Article. If a unit owner wants to install a new duct or vent in the common element or exterior of the building, other than for

the repair or maintenance of an existing one, he or she needs to get approval from the council.

There is nothing harsh, strange, or oppressive about Art. IX. It is a requirement that is not only common but probably universal in residential condominium regimes, and it has an obviously beneficial purpose. As noted, *the law itself imposes that requirement.*

On the supposition that, unless the requirement of council approval provided for by both the statute and Art. IX of the bylaws is somehow rendered inapplicable Ms. Garfink will not be able to dry her clothes, the Court holds that the requirement is, indeed, inapplicable. To achieve that objective, the Court tacitly construes the exception in Art. IX for "repair"[2] as extending to punching holes in the exterior wall for *new* pipes, ducts, condu` vents, and the like. That is a rather dramatic extension, for which the Court cites no authority, and creates a loophole that could well emasculate the requirement of council approval. Indeed, such a cavalier extension could well inject considerable confusion and uncertainty into the law of easements generally. Perhaps wary of the implications of such a tortuous ruling, the Court declares it applicable only "to the particular situation here extant" (Opinion at 398, 897 A.2d at 220) or "to instances where the inherent problem results from an initial construction defect and where the Condominium Declaration contains an express easement *and* there is a Bylaw exception permitting the repair without prior approval" Opinion at 402, 897 A.2d at 222). That continues to presume, however, that the exception in Art. IX for "repair" includes the installation of new invasions of the common

---

2. It is not entirely clear whether the majority favors Ms. Garfink's position because of its construction of "repair." For example, the majority states, op. at 398, 897 A.2d at 220, that "[w]e believe that in the unusual circumstances of this case, the situation is the functional equivalent of *maintenance* necessary for the reasonable and safe operation of the dryer." (Emphasis supplied). The majority relies elsewhere on "maintenance" also (*see* Maj. op. at 396, 897 A.2d at 219), but confusingly alludes to "repair" as equally justifying its conclusion. *See* Maj. op. at 400, 897 A.2d at 221 and 404, 897 A.2d at 223–24.

elements and exterior walls, and thus is not so limiting as the Court perhaps intends.

Upon this analysis, it is not at all clear just how small the bubble is that the Court has created. What is "the particular situation here extant?" What is a "construction defect?" Suppose the contract required an exhaust fan over the stove or in the bathroom and the developer forgot to install it or installed it improperly? Would Ms. Garfink, nine years later, be able to punch new holes in the exterior wall or roof, at a location of her choosing, to accommodate the belated addition of a range hood or bathroom exhaust fan on the theory that she was correcting a construction defect? The bubble requires that the condominium contain "an express easement." What kind of easement will suffice; does it matter how the easement is worded? Must the easement be precisely in the language of this one in order for the new special rule to apply and, if not, how much of a deviation will be allowed? Does the Court really intend to hold that the words "maintenance" or "repair," as used in the statute, the easement, and the bylaw, encompasses new invasions of the exterior walls and other common elements for the installation of new pipes, ducts, and vents? If so, the ruling in this case will affect virtually every condominium in the State, not to mention rights-of-way and other forms of easements. It will not be limited at all.

That is the first problem with the Court's analysis; the contour of the bubble created for Ms. Garfink is not at all clear. Even if it could properly be construed as limited to Ms. Garfink's peculiar situation, how is such a ruling consistent with the long-standing principles governing the exercise of our discretion in granting *certiorari?* How is this case, as molded by the Court, of any importance to anyone other than Ms. Garfink and the council of unit owners of The Cloisters at Charles, Inc.? Is there another Ms. Garfink out there somewhere?

Finally, on this record, the Court's disregard for the plain meaning of each of the provisions it acknowledges as relevant is wholly unnecessary. There is a far easier way to allow Ms. Garfink to connect her dryer to the outside world and a far more important principle to confirm. Although Ms. Garfink did not seek approval from the council before installing her

vent—hence the action for injunctive relief to require her to remove the vent—the Circuit Court stayed its ruling in favor of the council so that the parties could negotiate a sensible solution. Unfortunately, it appears that egos got in the way of common sense. It seems clear from the record that the council *did* consider her proposed solution and rejected it in favor of alternatives that were either equally violative of the Fire Code or unreasonably expensive and that, as a result, were rejected by Ms. Garfink.

When, either as part of a condominium regime or as a result of restrictive covenants in a deed, an owner is required to seek and obtain approval from a council, board, or association created by or through the property documents before undertaking some improvement or alteration to the exterior of the owner's property, the body with approval authority must act reasonably and in good faith. It may not reject an application arbitrarily or capriciously. *See Kirkley v. Seipelt,* 212 Md. 127, 133, 128 A.2d 430, 434 (1957) (refusal "would have to be a reasonable determination made in good faith, and not high-handed, whimsical or captious in manner"); *Carroll County v. Buckworth,* 234 Md. 547, 553, 200 A.2d 145, 147 (1964) ("approval or disapproval must be reasonable and ... the power must be exercised in good faith"); *Harbor View Imp. Ass'n v. Downey,* 270 Md. 365, 373, 311 A.2d 422, 426 (1973); *Colandrea v. Wilde Lake,* 361 Md. 371, 761 A.2d 899 (2000). In *Markey v. Wolf,* 92 Md.App. 137, 163, 164, 607 A.2d 82, 95 (1992), the Court of Special Appeals (Cathell, J.) correctly noted that approvals and disapprovals are not treated equally, and that, because a disapproval may constitute a restraint on the free use and alienability of land, a disapproval "should be very closely scrutinized."

Ms. Garfink is entitled to have, and use, a clothes dryer in her home, and it must be vented to the outside in order to conform to the Fire Code. On this record, it is unclear where the most appropriate place for the vent is, comparable to where other dryer vents in the condominium are located. *See* n. 1, *supra.*

The only significance that this case, with its peculiar facts, really has is in confirming once again the principle that approval bodies must act reasonably. That *does* have public importance; that *is* a "cert-worthy" issue. Resolution of that issue as I propose it will allow Ms. Garfink to dry her clothes lawfully. It will achieve the Justice sought by the Court without torturing basic legal principles and making bad law. I too would reverse the judgment of the Court of Special Appeals, but I would remand the case to that court with instructions to reverse the judgment of the Circuit Court and remand to that court for the parties to introduce into evidence the documents reflecting where dryers are vented (and/or were vented at the time of original construction of the condominium units) in all units similar to the one Ms. Garfink occupies. With that basis in place, a reasonable resolution of this dispute should be clear. Should the parties not reach an amicable solution, the Circuit Court may assess the reasonableness of the parties' competing positions. I would continue the stay until a final resolution is achieved.

Judges HARRELL and BATTAGLIA authorize me to state that they join in this dissent.