CLEMSON t/a CLEMSON AIR CHARTER ETC. *v.*
BUTLER AVIATION-FRIENDSHIP, INC.

[No. 46, September Term, 1972.]

*Decided November 9, 1972.*

The cause was argued before MURPHY, C. J., and McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Ernest C. Trimble,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellants.

*Browne L. Kooken* for appellee.

SMITH, J., delivered the opinion of the Court.

This litigation apparently was provoked by an attempt to use an airplane at Friendship International Airport for a suicide. We shall here sustain the decision of a trial judge (Maguire, J.) who concluded that a bailee had exercised ordinary care and diligence in safeguarding property delivered to it for repairs.

Appellee, Butler Aviation-Friendship, Inc. (Butler), carried on a business at Friendship International Airport (Friendship) related to the hangar storage of aircraft, refueling of aircraft, parking of aircraft, "general assistance to the corporate aircraft, pilots and passengers," and maintenance of aircraft.

In October, 1967, Dr. John Clemson (Clemson), the appellant who operates under the name of "Clemson Air Charter," entrusted an airplane to Butler for certain repairs. The plane was parked and tied down in an area known as the north ramp approximately 200 yards from Butler's hangar and repair shop. This area is approximately 275 yards from a fence and gate separating the public highway leading into Friendship from the property leased by Butler from Friendship. While in the parked position it had chocks under its wheels, each wing securely tied by a rope to the mooring cable on the pavement, locked tail wheel which could only be unlocked by a knowledgeable person entering the cockpit and pulling the switch which released the tail lock, and a "control

lock" which restricts the movement of the control surfaces and virtually prevents anyone from sitting in the pilot seat until the control lock is removed.

Between October 20, 1967, when repairs were requested by Clemson, and October 23, 1967, Clemson's plane was moved to a point immediately outside of Butler's hangar, located about 200 feet from the fence and main gate leading up to the public highway. At that time the tie down ropes were removed and the control locks and tail lock were unlocked. The plane was placed in a position approximately 25 feet outside of the door regularly used by Butler's employees to enter and leave the electronic shop and hangar. The plane was parked facing away from the hangar with the door for entry into the aircraft being located on the west side of the airplane and, therefore, where all employees of Butler had to pass the door for access to Clemson's plane in the performance of their regular duties. Chocks were placed under the wheels, but the plane was not otherwise secured. In its new position it could be readily seen by all of the public traveling on the highway leading to and from Friendship.

On the afternoon of October 24 an employee of Butler entered the aircraft and found a man "sitting on one seat kind of sprawled into the next seat." He was described as having "dried blood around both undersides of the wrists and neck," the blood being on each wrist and "[i]n a circular manner about 160 degrees" about his neck. It was reported that "no red or flying blood" was seen. The person found indicated that he had tried to do away with himself.

Clemson placed into evidence a statement from an airplane pilot named Joseph Toskas (Toskas) who walked by Clemson's plane. He said that he used to fly this plane and he knew that it was owned by Clemson. Toskas stated that he saw "[t]he left propeller was going up to compression. The lights were down and on." He pointed to his eyes, a sign to the pilot that the lights were on. The individual was unsuccessful in starting the plane. He

"fumbled around for 15 to 20 seconds to turn the lights off." There were chocks under the wheels at the time. Toskas returned in about 20 minutes. He then saw an ambulance taking away the individual he had observed attempting to start the plane.

It developed that extensive damage had been done to the plane. The instrument panel had been smashed and apparently pieces of glass were used by the man in a suicide attempt. Almost all of the switches had been turned on and an attempt had been made to move and work all of the controls as well as an attempt to start the engines.

Butler sued Clemson for the cost of repairs. Because of certain procedural difficulties, not here relevant, a separate suit was filed by Clemson "to his own use and to the use of Lloyds of London" for damages in the nature of loss of income sustained by Clemson because of the damage to this plane while "in the care and custody of Butler for repairs" and also because of the delay by Butler in making repairs. The cases were consolidated for trial. Judgment in each suit was entered in favor of Butler. Although an appeal was entered in both suits, Clemson here presents but two questions, (1) whether Butler "exercise[d] ordinary care and diligence in safeguarding the property of Clemson to the end that the loss to Clemson might have been avoided," and (2) whether Butler "ma[d]e the necessary repairs to [Clemson's] aircraft in a timely manner, [Butler] having had the aircraft in its possession for repair from October 24, 1967 to February 1, 1968."

One thing upon which the parties can agree is that this case involves a bailment for hire or mutual benefit and that the applicable law as to the liability of the bailee was summed up for the Court by Judge Hammond in *Fox Chevrolet Sales v. Middleton*, 203 Md. 158, 99 A. 2d 731 (1953):

> "[W]here . . . a demand and an unexplained refusal to deliver [bailed property] are proven,

a *prima facie* case of negligence is made out; yet, when the loss or injury is accounted for as having been occasioned by a cause which would excuse the bailee, such as a burglary of his premises, then the defense is complete, unless the bailor follows by showing that the bailee, by the exercise of ordinary care and diligence might have avoided the loss or injury. The burden of proving negligence never shifts from the plaintiff. He must prove the delivery, the bailment and the failure to return; thereupon, it is incumbent upon the bailee to explain that failure. If he does so, the bailor must prove that the bailee failed to use ordinary care and diligence to safeguard such property and that his failure to perform that duty caused the loss." (Citing cases.) *Id.* at 161.

In *Fox* the Court was concerned with the sufficiency of the evidence to submit the question of the negligence of the bailee to the jury. The building there was located in an industrial area of Baltimore. At night the rear of the premises was removed from the sight of passersby on Hanover Street which "would afford prowlers and burglars an excellent opportunity to perform their missions in comparative leisure and safety because of its isolation." A rear door leading to the area where the car in question was located was secured by a padlock attached to a hasp nailed to the exterior of the door. Inside there was another door similarly locked. Both locks were broken on the night of the theft. A night watchman was employed, but did not always appear. He failed to appear on the night in question. He was employed after there had been acts of vandalism. This Court held that reasonable men could well find, as the jury did, that the bailee had failed to live up to the duty required of it.

More recently, in *Johnson and Towers v. Babbington,* 264 Md. 724, 288 A. 2d 131 (1972), we were faced with a suit to recover the value of tools lost during a burglary.

That, too, was tried by a jury. There was evidence from which a jury could have concluded that the mere lighting of the premises was not a sufficient precaution when taken in conjunction with testimony that the locks at the foot of certain doors were ineffective, that steel pins inserted in the door track could be reached from the outside if a pane of glass in the door were broken, that the doors could be opened, either by pressing the switch which could be reached through the broken pane, or by lifting the spring-balanced door, that even the locked crib which had been broken and entered offered insufficient protection, and three or four prior attempts had been made to break into the building, at least one of which had been successful. We held under those circumstances there was sufficient evidence to go to the jury.

For cases involving bailment tried before the court in which the bailor has not been permitted to recover *see Stehle Equipment Co. v. Alpha,* 247 Md. 210, 213-14, 230 A. 2d 654 (1967), and *Trans-System Service v. Keener,* 249 Md. 369, 373, 239 A. 2d 897 (1968).

When a matter is tried before the court without a jury the evidence must be viewed in the light most favorable to the party prevailing below. *Liller v. Logsdon,* 261 Md. 367, 368, 275 A. 2d 469 (1971) ; *Simmons v. B & E Landscaping Co.,* 256 Md. 13, 17, 259 A. 2d 314 (1969) ; *Burroughs Int'l Co. v. Datronics,* 254 Md. 327, 337, 255 A. 2d 341 (1969) ; and *Goodwin v. Lumbermens Mut. Cas. Co.,* 199 Md. 121, 129-30, 85 A. 2d 759 (1952), although the conclusions of law based upon the facts are reviewable by this Court, *Simmons* at 17 and *Space Aero v. Darling,* 238 Md. 93, 106, 208 A. 2d 74 (1965), cert. den., 382 U. S. 843 (1965), and cases there cited. We also must bear in mind Maryland Rule 886 that "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Moreover, the comment of Judge McWilliams for the Court in *Racine v. Wheeler,* 245 Md. 139, 144, 225 A. 2d 444 (1967), "Since the jury

is free to believe only a portion of the evidence of each side the synthesis apparently accomplished by the jury is simply a manifestation of its obvious function." is no less true when a judge is the trier of the facts. *Davidson v. Katz,* 254 Md. 69, 80, 255 A. 2d 49 (1969).

Clemson here argues that "the proximate cause of the damage to [his] aircraft" was "the act of [Butler] in taking possession of [Clemson's] aircraft, one, two or three days prior to the time when they would have an employee available to work on the requested repair," that "ordinary care and diligence would require [Butler] to permit the aircraft to remain in its place of safety on the north ramp, securely tied down in line with dozens of aircraft on either side of it and dozens of aircraft across from and parallel to the line in which [Clemson's] aircraft was parked, until [Butler] was ready to work on the repairs to the inverter system requested by [Clemson]," that Butler's employees "could have re-activated the 'control lock' . . . which would have prevented the movement of the controls and the control surfaces," and finally that the vandal should have been seen by Butler's employees.

In his opinion the trial judge said:

"The testimony indicates that, particularly by Mr. Green, the Operations Manager, there has never been a situation such as this at Butler in the past. They have had no problems with damaging or stealing aircraft. On occasion, they have experienced some vandalism.

"The Court is of the opinion that the bailee, Butler, exercised ordinary care and diligence in safeguarding the property of Clemson, and could not be held accountable for the activities of the individual, Thompson."

As every bleacher fan and every Monday morning quarterback know, it is easy to second guess any situation. All such second guessing is not necessarily so persuasive as to convince an unbiased individual of its cor-

rectness. The evidence of prior "vandalism" consisted of testimony as to thefts in the hangars and in the tie down area where the planes were parked. There was no testimony presented as to vandalism in the area where this incident took place. In the light of hindsight perhaps Butler should have placed a custodian with the plane. The absence of such custodian without evidence of need for him, however, would not establish lack of ordinary care and diligence. The incident here in question took place in broad daylight. There was evidence from which the court could have concluded that the trespasser was in the plane but a little more than 20 minutes and that the plane "was parked so close to the premises that if the plane had started, it would have blown the windows out." It was not precisely established as to when the plane was removed into the position where it was entered by the vandal. In determining whether the bailee exercised ordinary care and diligence we must examine the time period in which the incident took place or in which the trier of fact could have found that it took place, not whether there was adequate protection at some point in time prior to the incident in question. No evidence was presented to indicate that Butler should have anticipated that damage would take place in the daylight hours at a point within 25 feet of its hangar where all Butler's employees had to pass the door to Clemson's plane in the performance of their regular duties. The burden of proof was upon Clemson. Judge Maguire as the trier of fact was not obliged to believe Clemson's version of the case. Therefore, we cannot say that his judgment was clearly erroneous when he was not satisfied that Clemson established that Butler failed to exercise ordinary care and diligence in safeguarding the property of Clemson.

On the issue of making repairs in a timely manner, the trial judge said:

"With respect to the claim of Clemson for loss of use and the subrogate rights of Lloyds

of London, there is no indication from the testimony that Butler failed to deliver [the] plane . . . within a reasonable time or that a claim was made by Clemson for delivery at an earlier date. Furthermore, the communications between Butler and Clemson were poor as evidenced by the testimony by Butler's employees that they could not reach Clemson, as there was no listing for Clemson Charter Service in the telephone directory. Also, it is clear to the Court that Clemson did not insist upon delivery or in any way attempt to move the plane so that work could be completed elsewhere. Finally, work was still in progress in December of 1967 and the work was completed January, 1968."

There was evidence to support the trial judge's conclusions. Again, the burden of persuasion was upon Clemson. Therefore, we cannot say that the trial judge's judgment was clearly erroneous. Rule 886.

> *Judgments affirmed; appellant to pay the costs.*