939 A.2d 165

**Stuart P. WHITE, et al.**

**v.**

**The PINES COMMUNITY IMPROVEMENT ASSOCIATION, INC., et al.**

**No. 29, Sept. Term, 2007.**

Court of Appeals of Maryland.

Jan. 10, 2008.

William M. Simmons, Annapolis, Tarrant H. Lomax (Tarrant H. Lomax, Annapolis), on brief, for petitioners/cross-respondents.

Christopher F. Drummond, Centreville, Mary Beth Gleaves (Karl D. Gleaves, Arnold), on brief, for respondents/cross-petitioners.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, JOHN C. ELDRIDGE, (retired, specially assigned), ALAN M. WILNER, (retired, specially assigned), DALE R. CATHELL, (retired, specially assigned), JJ.

CATHELL, J.

More than a hundred and thirty years ago we described the common law of riparian rights in *B. & O.R.R. Co. v. Chase*, 43 Md. 23, 34–36 (1875). There we said:

> "By the common law it is well settled, that where land lies adjacent or contiguous to a navigable river, in which there is an ebb and flow of the tide, any increase of soil formed by the *gradual and imperceptible recession* of the waters, or any gain by the *gradual and imperceptible formation* of what is called alluvion, from the action of the water in washing it against the fast land of the shore, and there becoming fixed as part of the land itself, shall belong to the proprietor of the adjacent or contiguous land." 2 Bl. Com. 261; *Giraud v. Hughes*, 1 G. & J. 249. And the right to accretion, thus formed, is considered as an interest appurtenant to the principal land, and belonging, in the nature of an incident, to the ownership of that, rather than as something acquired by prescription or possession, in the ordinary legal sense of those terms. *And in addition to this right by reliction or accretion, the riparian proprietor, whose land is bounded by a navigable river, whether his title extends beyond the dry land or not,*[1] *has the right of access to the*

---

1. In some areas of the state the descriptions of property (metes, bounds, and courses, etc.) carry the boundaries of the title conveyed out into the

*navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier for his own use, or for the use of the public,* subject to such general rules and regulations as the Legislature may think proper to prescribe for the protection of the rights of the public, whatever those rights may be. This is well established doctrine by both Federal and State courts.

"These riparian rights, founded on the common law, are property, and are valuable, and while they must be enjoyed in due subjection to the rights of the public, they cannot be arbitrarily or capriciously destroyed or impaired. They are rights of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that they be taken for public use, upon due compensation.... But these principles of the common law, governing the rights of the riparian owner, however well established, are subject to change and modification by the statute law of the State, and by the nature and circumstances of the grant by which the title may have been acquired to the land bounding on the river." (Some citations omitted.) (Some emphasis added.)

---

beds of watercourses, often when titles date back to the original patents that frequently contain descriptions carrying to the middle or the channel of this or that waterway.

Additionally, sometimes as the water levels rise the mean high tide line of navigable water courses moves landward transforming former fast land into the beds of the waterways. When that happens, properties that were formerly abutting on the waters become part of them. As an example, there are numerous platted lots out in the Atlantic Ocean east of Ocean City resulting from the rise in ocean levels that caused the barrier island, upon which Ocean City sits, to migrate (move) westward. As a consequence of that movement, land over the years was re-platted creating new water front lots. But what happened to the platted lots to the east now out under the ocean?

The intellectual abilities of the Real Property Bar will be taxed to the ultimate if water levels ever fall and the island moves eastward again and conflicting claims to riparian rights are made based upon the early plats and the re-plats. If that were to ever happen, the "real" real property afficionados trying to sort out the mess, will be as happy as a tick that has been on a dog for two days. Alas, for the writer, the tides of time will probably cause him to miss this great event.

Almost a hundred years later, in *Bd. of Public Works v. Larmar Corp.*, 262 Md. 24, 37, 277 A.2d 427 (1971), we restated the common law of riparian rights, adding, in part:

"In assessing the changes that have occurred in riparian rights down the corridor of years it is well to keep in mind an appreciation for the basic rationale behind the rule of law which gave to the riparian owner the rights to land surfacing through the process of accretion or reliction. *In its nascency, the sole purpose of the rule was to assure to the riparian owner that he would never be cut off from his access to water.* If an intervening party were permitted to gain title to accretions or to land exposed by the subsidence of water, the riparian landowner would be deprived of his valuable water-access rights."[2] (Emphasis added.)

*See also, Worton Creek Marina, LLC v. Claggett,* 381 Md. 499, 509, 850 A.2d 1169, 1174–75 (2004).

While other doctrines (i.e., "ouster," "adverse possession," and "easements") are presented by the parties in this case, the real fight, as it usually is in riparian rights issues, is over access to water and who has it.

---

**2.** A question thus exists as to whether riparian rights can even be lost under the theory of adverse possession or prescription. We note that there are conflicting cases in other jurisdictions. We have never decided the issue. As the water level rises and the mean high tide mark advances landward, new waterfront properties come into being to which riparian rights become appurtenant. If water levels were to fall, the mean high tide mark would move channelward out into the waters, eventually moving past the area of riparian rights previously claimed by adverse possession. As only riparian rights would have been claimed by adverse possession (as in the present case), i.e., the right of access to water, and no fast land is claimed, how would title to the new land created channelward of the area where riparian rights have been claimed, be established? Considering the unique nature of riparian rights, it may be doubtful whether they can be obtained under the theory of adverse possession or prescription. How can a property right which by its very nature must be attached to fast land, be severed from it? How can an unattached riparian right exist—ever? In light of the fact that the lower court and the Court of Special Appeals have found and affirmed that, in any event, the requirements of adverse possession have not been met in this case, and we agree, we need not resolve that issue in this case. We expressly leave it for another time.

This case requires this Court to consider the various property rights of a waterfront community, as between the individual landowners and the Pines Community Improvement Association, Inc. Two petitions and one cross-petition for writs of certiorari from the Court of Special Appeals' decision have been granted. *White v. The Pines*, 399 Md. 595, 925 A.2d 634 (2007). The first petition, consisting of petitioners Stuart White, Sondra White, Gayle Clow, Gill & Associates, Allen Carey Garman, Steven G. Garman, Joseph Donahue and Cynthia Donahue[3], all of whom were owners of individual lots that, but for a strip of community property separating their lots from the waters of Chase Creek, would have been waterfront properties which would have inherently had riparian rights.[4] Petitioner A presents the following questions:

"1. When the Court of Special Appeals found that the use of certain piers began under an easement, and thus began as a permissive use, was the Court correct in rejecting the principle that an ouster could change the use from permissive to adverse, thus allowing adverse possession or a prescriptive easement to arise 20 years after the ouster?

"2. When an easement to the water grants the easement holder the right to build a pier, and the easement holder does so, is the ownership of the pier vested in the easement holder by severance of the riparian rights under the easement, or in the land owner by Maryland Code, Environment Art., Section 16–201?

---

3. For the sake of clarity, these petitioners, all of whom are pier builders or whose predecessors in title built piers, sometimes shall, as a group, be referred to collectively as petitioner A.

4. The "key deeds" in the chains of title from which most, if not all, these petitioners obtained their property contained language relating to riparian rights similar to: " . . . the use in common with others . . . of the community lot on said Plat and all water and riparian rights incident thereto." The phrase "key deed" is defined in *Bright v. Lake Linganore Ass'n, Inc.*, 104 Md.App. 394, 404, 656 A.2d 377, 383 (1995), as "the deeds first subjecting each of the lots at issue . . . to . . . the . . . Declaration [whatever conditions were imposed in the Declaration in that case] . . . . "

"3. When a covenant or easement is placed in a chain of title to certain property by the developer to protect uses granted to others over that land, may a later owner of that land, or a court at that land owner's request, ignore or treat the covenant or easement as meaningless?"

The second petition for certiorari, filed by petitioners Douglas W. Johnston, Jr., William C. Simmons and Mary J. Simmons [5], presents the following questions for our review:

"I. DID THE COURT OF SPECIAL APPEALS FAIL AS A MATTER OF LAW TO CORRECTLY INTERPRET THE LANGUAGE OF A MORTGAGE, PLAT AND DEED GRANTING TO PETITIONERS RIGHTS TO THEIR RESPECTIVE PIERS FROM THEIR RESPECTIVE LOTS, ACROSS COMMUNITY LAND, AND OVER THE WATERS OF CHASE CREEK AND INSTEAD AWARDING TO THE PINES COMMUNITY IMPROVEMENT ASSOCIATION, INC. A USE IN COMMON TO THOSE PIERS?

"II. DID THE COURT OF SPECIAL APPEALS ERR IN AFFIRMING THE DECISION OF THE CIRCUIT COURT WITH RESPECT TO THE PETITIONERS' CLAIMS OF OUSTER OF THE PINES COMMUNITY IMPROVEMENT ASSOCIATION, INC. FROM THE FEE SIMPLE OWNERSHIP OF THE COMMUNITY LAND ADJACENTTO THEIR RESPECTIVE PROPERTIES AND ADVERSE POSSESSION OF THAT COMMUNITY LAND?

"III. DID THE COURT OF SPECIAL APPEALS ERR IN DETERMINING THAT THE PINES COMMUNITY IMPROVEMENT ASSOCIATION WAS ENTITLED TO JOINT USE OF THE PRIVATE PIERS ADJACENT TO THE PETITIONERS' RESPECTIVE LOTS AS A RIPARIAN OWNER WHEN THE PRIVATE PIERS ORIGINATED ON THE PRIVATE LOTS OF THE PETITIONERS, CROSSED OVER 'USE IN COMMON'

---

5. These three petitioners sometimes shall be referred to collectively as petitioner B.

COMMUNITY LAND, AND EXTENDING OVER THE
WATERS OF CHASE CREEK?" (Bolding in original.)

Finally, the Pines Community Improvement Association, Inc.,
("respondent/cross-petitioner") presents the following ques-
tions for our review:

"1. Did the Court of Special Appeals err in failing to
uphold the Trial Court's decision establishing a system that
provided for the common use of piers attached to Communi-
ty Lands even though the Court of Special Appeals recog-
nized that the PCIA and all other property owners in the
Pines community have the 'right to build and enjoy piers *in
common* with all other lot owners'?

"2. Did the Court of Special Appeals err in reversing the
Trial Court's award of damages in amounts equal to the
rental value of pier slips where certain property owners
excluded the PCIA and other lot owners from the 'use in
common' of these slips?"

We affirm, in part, the judgment of the Court of Special
Appeals, and hold that the lot owners in this case have only
easements in common with all other like lot owners in the
community to riparian rights, that PCIA is the owner of all
portions of the piers adjacent to the Community Lands and
Community Lot that are situate over or that abut channelward
from Community Lands or the Community Lot, and that
consequently, such piers are equally available to all lot owners
in common with all other lot owners, including PCIA, with
such availability limited to access from Community Land or
the Community Lot. For the reasons stated *infra*, we shall
vacate that part of the trial court's order that conferred upon
the PCIA express management authority over those piers not
situate adjacent to the Community Lot.[6] We further hold that
the Court of Special Appeals was correct in reversing the

---

**6.** There may be covenants or provisions in the title documents that are
not readily discernable from the record that would authorize PCIA to
manage all of the piers. If so, that is a matter for further negotiation,
settlement or litigation. Additionally, management by PCIA may or
may not be prohibited by various statutory provisions, one of which is
discussed *infra*.

decision of the trial court awarding damages equal to the amount of the past rental value of the pier slips.

## I. Facts

The facts and procedural history, as found by the trial court, indicate that the development process began in 1922. At that time, a Plat was recorded in the Land Records of Anne Arundel County by a Mr. Leonidas Turner, then a principal of The Severn River Company, and his wife, Amelia A. Turner. They evidently intended to create a new residential community to be known as "Pines–on–the–Severn" ("the Pines") wherein some access to the waterfront for all Pines' residents would be an important feature. To that end, they created via that Plat a ring of land between Chase Creek and lots near the water, which was referred to as "Community Land". A second Plat was recorded in 1924. That had the effect of expanding the community property to the entire waterfront of the Pines. In 1926, The Severn River Company was evidently succeeded by The Pines Company. The relevant grant to that entity included:

> "[a]ll parts thereof marked Community Land or Community Lot, and all the roads, ways, streets, lanes[,] alleys, and paths, piers, riparian and water rights appurtenant to said Community lands, streets, roads, lanes, ways, alleys, and paths, being subject to such rights therein as granted to the owners of such lots or parts of said tract in the deeds from the said The Severn River Company heretofore executed and recorded." [7]

Later, in 1926, the Pines Community Improvement Association, Inc. ("PCIA") was formed by incorporation, as noted in the joint stipulation of facts in the Circuit Court. According to its Certificate of Incorporation, the PCIA's function was:

---

**7.** Some early off-conveyances of lots from The Severn River Company included the language as: "also the use in common with others of the road extending from Chase Creek to the Baltimore and Annapolis Boulevard and also the use in common with others entitled thereto of the lots of ground designated as Community Lot on said Plat and all water and riparian rights incident thereto."

"To control and care for the Community lots and beaches, the water supply, fire protection, sanitation, enforcement of restrictions, roads, police, lighting, legislation, transportation and all other matters in which the community interest as a whole is involved." The joint stipulation of facts informs us that membership in PCIA is voluntary and at the time of this litigation, consisted of approximately 114 lot owners, including at least some of the petitioners.[8]

Also in 1926, The Pines Company (as indicated above, the apparent successor to The Severn Company) conveyed to PCIA a deed granting it a waterfront lot as shown on the 1922 Plat, which became known as the "Community Lot."[9] That conveyance also included the "use in common language," and was granted subject to covenants contained in the *habendum* clause, which stated in relevant part:

"TO HAVE AND TO HOLD the said lot of ground and premises above described and mentioned, and hereby intended to be conveyed, together with the rights, privileges, appurtenances and advantages, thereto belonging or appertaining, unto and to the proper use and benefit of the said Pines Community Association Incorporated, and for the title holders from The Pines Company, Incorporated, or Leon[id]as G. Turner, their successors or assigns, in fee simple, subject, however, to the following covenants, and agreements which are hereby entered into by the [PCIA], its successors and assigns, with the said The Pines Company, Inc., as part of the consideration of this deed.

. . .

"That the said grantee doth hereby covenant and agree for itself, its successors and assigns, that the land hereby conveyed, shall be liable annually for the proportionate

---

8. Our review of the record does not reveal that the creation of a community association was provided for by covenants in the relevant instruments in the chain of title.

9. We shall sometimes refer to "Community Land" and "Community Lot" as community property.

amount of the cost of maintaining the roads, included in the area of the Pines–on–Severn, for the total square feet in said lots said proportionate amount not to exceed, however, the sum of Sixty-dollars ($60.00) to be paid annually on the 15th day of March, in each year, by the grantee, its successors and assigns, to the Pines Company, its successors and assigns, or to such person or body corporate, as it or they may direct.

. . .

"IT IS DISTINCTLY UNDERSTOOD AND AGREED BETWEEN the parties hereto, that all covenants and agreements above expressed, shall be held to run and bind with the land hereby conveyed, the acceptance of this deed, shall have the same effect and binding force upon the grantee, its successors and assigns, as if the same were signed and sealed by the said Pines Company, Inc[.], and of the grantee; provided however, that the covenants contained in this deed may be changed with the written consent of the said The Pines Company, Inc. and of the [PCIA], their successors and assigns." [10]

In 1928, what became known as the Machen mortgage was executed between The Pines Company as mortgagors and Mary G. Machen as mortgagee. It encumbered the title to the remaining lots in The Pines, including any Pines Company community property, to Mary G. Machen, in exchange for $35,000 to the The Pines Company. That mortgage included the following descriptive language: "roads, ways, streets, lanes, alleys and paths, piers, riparian and water rights appurtenant to the land known as Pines on the Severn, subject however, to the use of the adjacent lot holders therein, and also all water works. . . ." Upon default and foreclosure of the Machen Mortgage in 1932, Pines–on–the–Severn, Inc. ac-

---

10. We have not been directed to any part of the record where there was any such written consent to any changes by all of the owners of property where title evolved from The Pines Company, Inc., the PCIA and their successors in title, i.e., apparently all of the owners in "The Pines."

quired title and assumed the mantle of developer through 1958. During that time period, conveyances from Pines–on–the–Severn, Inc. included similar "use in common language" as contained in the prior deeds from the original developer.

In 1952, the remaining lots, including community property, were conveyed from Pines–on–the–Severn to the Pumphreys and the Obrechts. The conveyance was: "subject, however, to the rights of owners of property in the development to the areas designated as 'Community Land' and 'Community Lot.'" In 1962, Chas H. Steffey, Inc. obtained all remaining lots and in turn conveyed them to White Acre, Inc. In 1966, White Acre conveyed its interest in the community property to PCIA in fee simple, and made the conveyance "subject to such rights and privileges [whatever they might have been] heretofore granted from time to time by the Grantor to others ... to use said property hereby conveyed for the purpose set forth by such grants."

Over the course of time, several lot owners built piers adjacent to their respective properties that traverse and/or abut the creek side of the community land as shown on the 1920's plats. Conversely, during that same period, PCIA undertook particular acts that asserted its ownership of the property at issue, including community walks [11] and it adopted a pier management plan in September 2003.[12]

---

11. Beginning in the 1960's and continuing to present day, these "community walks" were advertised throughout the Pines by way of the PCIA newsletter. They include walking on community lands and have at one time or another included walking on each of the piers extending from the community property.

12. The pier management plan included a system for distribution of slips on piers located in the Pines, requiring a lot owner to join PCIA and remain in good standing to have permission to maintain a slip. The plan provides that application for a slip may be made after the posting of a refundable bond and paying a yearly maintenance fee. A fifteen dollar per day wet storage fee is assessed for boats in slips without assignment thereto. The plan apparently contemplated that PCIA would assume control over the piers and slips built by the individual lot owners with the intention that such piers would be limited to use by lot owners designated by PCIA according to specific criteria created by it. The actions of PCIA in asserting ownership of the piers and attempting

In December 2003, certain of the petitioners filed a complaint in the Circuit Court for Anne Arundel County seeking declaratory and equitable relief regarding certain piers near their homes extending across Community Land into the waters of Chase Creek. On January 20, 2004, PCIA answered the complaint and filed a motion to dismiss, alleging that the original petitioners had failed to join the necessary parties, which was denied April 16, 2004. On June 13, 2004, PCIA filed a counterclaim against the original petitioners, seeking damages for alleged violations of the slip assignment provisions of its bylaws. The original petitioners answered and denied responsibility to PCIA for damages. On July 26, 2004, the Circuit Court granted a motion to intervene filed by Mary E. Gleaves and Karl Gleaves, who were also lot owners in Pines–on–the–Severn.

The first stage of the trial was held on April 13 and 15, 2005, whereupon the Circuit Court concluded that full relief could not be afforded without providing all lot owners in Pines–On–The Severn an opportunity to intervene and be heard. On June 7, 2005, the Court entered a show cause order pursuant to Maryland Rule 2–211, *sua sponte*, and directed the parties to cause the order to be served upon all lot owners in Pines–on–the–Severn.

On July 8, 2005, PCIA filed a cross-claim against the owners of a number of lots whom they alleged to be similarly situated to the original petitioners, also seeking damages. In its cross-claim, PCIA asserted ownership of the community property and the right to control and regulate the use of the piers. Cross-defendants Mr. and Mrs. Gleaves answered and denied responsibility to PCIA for damages.

Trial resumed on December 21, 2005. On December 28, 2005, the Circuit Court for Anne Arundel County, by memorandum and order, ruled in favor of PCIA, ordering:

---

to assume control of the piers and the respective lot owners response is the primary focus of the present dispute.

"1. The Pines Community Improvement Association, Inc. holds fee simple title to the Community Land or Community Lot ('Community Land') shown on the 1922 and 1924 Plats of Pines–On–The–Severn recorded among the Land Records of Anne Arundel County.

"2. The Pines Community Improvement Association, Inc. owns all improvements existing on the Community Land, including all piers, pilings, boathouses and steps leading to piers.

"3. The claims of the Plaintiffs and Cross–Defendants that they have acquired title to portions of the Community Land, piers and boathouses extending from the Community Land, and, steps leading to piers existing on Community Land by adverse possession are denied.

"4. The claims of the Plaintiffs and Cross–Defendants that they have acquired a prescriptive easement for the exclusive use of portions of the Community Land, piers and boathouses extending from the Community Land, and steps leading to piers existing on Community Land by adverse possession are denied.

"5. The claims of the Plaintiffs and Cross–Defendants that the Machen mortgage and subsequent deed grant them an interest in portions of the Community Land or piers and boathouses extending from the Community Land different than the interest enjoyed by all property owners in Pines–On–The–Severn are denied.

"6. The Plaintiffs and Cross–Defendants are enjoined from claiming or asserting, in an action at law or otherwise, that they have any claim of ownership of, title to, prescriptive easement over, or exclusive right to use or control any portion of the Community Land and any improvement existing thereon or extending therefrom.

. . .

"8. The Pines Community Improvement Association, Inc. is declared to have the right, power and authority to use, control, and regulate the use of the Community Land

and all improvements existing thereon, including the right (a) to assign boat slips at piers and boathouses extending from the Community Land (b) to charge fees for costs associated with the piers and boathouses and (c) to charge wet storage fees to boat owners that fail to comply with slip assignment regulations.

. . .

"10. Final judgments are entered against the Plaintiffs and Cross–Defendants for wet storage fees due and owing to The Pines Community Improvement Association, Inc. As follows:

(a) Joseph and Cynthia Donahue, jointly and severally, in the amount of $1,080.00.

(b) Douglas W. Johnston in the amount of $3,150.00.

(c) Keith and Dee Lyon, jointly and severally, in the amount of $7,740.00.

(d) Gayle Clow in the amount of $1,150.00

(e) Stuart P. White and Sondra R. White, jointly and severally, in the amount of $1,725.00.

(f) Allen L. Garman, Sr., Virginia E. Garman, Allen L. Garman, Jr., and Steven Garman, jointly and severally, in the amount of $14,430.00.

(g) Michael and Jill Donnelly, jointly and severally, in the amount of $1,575.00.

(h) Gill & Associates in the amount of $19,170.00."

A timely appeal[13] was noted to the Court of Special Appeals, which affirmed in part and reversed in part. It held, as relevant here:

---

13. There, the appellants included: Stuart P. and Sondra R. White, Joseph and Cynthia Donahue, Michael and Jill Donnelly, Gill & Associates, Gayle Clow, Steven Garman, Virginia E. Garman, Allen L. Garman, Sr., Allen L. Garman, Jr., Keith and Dee Lyon, Douglas W. Johnston, Jr. William C. and Mary J. Simmons, Douglas C. and Stephanie S. Rice.

"The deeds in the instant appeal created a property right for all lot owners. The express easements are for riparian rights and riparian rights include the right to wharf out. The PCIA has not constructed any piers and is the owner of the piers by virtue of its riparian land ownership. In more typical waterfront communities, easements created for lot owners are likely easements of use of piers and access to water. That is not the case in the matter under review because a grant of riparian rights without reservation includes the right to build piers as appellants did.

"The parties, thus, are equally vested with the legal right to build and enjoy piers in common with all other lot owners. The PCIA is both a lot owner in this context and the servient tenement. The inability of the parties to come to agreement on how to implement the shared rights of use and maintenance creates interference in the use and enjoyment of the easements for all parties. In the attempt to devise an equitable solution, the trial judge granted [exclusive] powers to the servient tenement.

"The fees that the PCIA established are not appropriate maintenance fees under easement law, as delineated in *Drolsum [v. Luzuriaga*, 93 Md.App. 1, 17–18, 611 A.2d 116 (1992)]. Fees based upon commercial usage and enforced for punitive purposes do not embody the legal principles of the easement law.

"The PCIA may not charge fees for usage of an easement granted expressly to lot owners and neither may lot owners exclude the PCIA or other lot owners from usage of piers. The issues before the Court allowed for determination of easement law application to a set of facts that do not lend themselves to the type of practical solution as decreed by the trial court. According legal effect, as we have accorded in this appeal, to the deeds and the express easements granted therein for riparian rights result in the only legally sound disposition. Were the PCIA both the owners of the riparian land and exclusive owners of the riparian rights incident thereto, an equitable solution similar to that pro-

posed by the trial court could allow for fees to maintain the easements of usage and access."

*White v. Pines Community Improvement Ass'n, Inc.,* 173 Md.App. 13, 70–71, 917 A.2d 1129, 1161–62 (2007).

On April 19, 2007, petitioner A filed with this Court a petition for a writ of certiorari, and on April 20, 2007, petitioner B also petitioned this Court for a writ of certiorari.[14] On May 4, 2007, respondents filed a cross-petition, and both petitions and the cross-petition were granted on June 13, 2007.

## II. Standard of Review

Maryland Rule 8–131 governs the scope of appellate review. It states, in relevant part:

"(c) **Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."

We have held that:

"When a matter is tried before the court without a jury the evidence must be viewed in the light most favorable to the party prevailing below. . . . We must also bear in mind . . . that 'the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses.' . . . 'Since the jury is free to believe only a portion of the evidence of each side the synthesis apparently accomplished by the jury is simply a manifestation of its obvious function[ ]' is no less true when a judge is the trier of facts."

*Clemson v. Butler Aviation–Friendship, Inc.,* 266 Md. 666, 671–72, 296 A.2d 419, 422 (1972) (citations omitted).

---

**14.** Not all of the appellants in the Court of Special Appeals joined in the petitions for certiorari.

We give no deference, however, to conclusions of law. " 'The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions. When the trial court's [decision] "involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct...." ' " *YIVO Institute for Jewish Research v. Zaleski,* 386 Md. 654, 662–63, 874 A.2d 411, 415–16 (2005) (quoting *Nesbit v. Government Employees Ins. Co.,* 382 Md. 65, 72, 854 A.2d 879, 883 (2004)). The interpretation of mortgages, plats, deeds, easements and covenants has been held to be a question of law. "That, as a general rule, the construction or interpretation of all written instruments is a question of law for the court is a principle of law that does not admit of doubt." *Gordy v. Ocean Park, Inc.,* 218 Md. 52, 60, 145 A.2d 273, 277 (1958) (citing *Sperling v. Terry,* 214 Md. 367, 370, 135 A.2d 309, 311 (1957); *Strickler Eng'g Corp. v. Seminar,* 210 Md. 93, 100, 122 A.2d 563, 568 (1956), *Roberts v. Bonaparte,* 73 Md. 191, 199, 20 A. 918, 919 (1890); *Hartsock v. Mort,* 76 Md. 281, 291, 25 A. 303, 305 (1892)).

## III. Discussion

*Garfink v. Cloisters at Charles, Inc.,* 392 Md. 374, 392–93, 897 A.2d 206, 216–17 (2006), offers clear instruction on the interpretation of instruments creating easements:

" 'In construing the language of a deed, the basic principles of contract interpretation apply. The grant of an easement by deed is strictly construed.... The extent of an easement created by an express grant depends upon a proper construction of the conveyance by which the easement was created.... "The primary rule for the construction of contracts generally—and the rule is applicable to the construction of an easement—is that a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible." ...' "

. . .

"A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intend it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give [way] to what the parties thought that the agreement meant or intended it to mean."

*Garfink*, 392 Md. at 392–93, 897 A.2d at 216–17. *E.g., General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *Bd. of Trustees of State Colleges v. Sherman,* 280 Md. 373, 380, 373 A.2d 626, 629 (1977); *Billmyre v. Sacred Heart Hosp.,* 273 Md. 638, 642, 331 A.2d 313, 316–17 (1975).

As Judge Davis in his excellent discussion in the Court of Special Appeal's opinion reasoned below:

"In the case *sub judice,* there is a covenant in the deed from the Pines Company, Inc. to the PCIA that was an express covenant meant to run with the land. That covenant was in addition to the use in common language found in the "BEING" clause of the PCIA's deed and appellants' deeds. The use in common language did not promise to do or refrain from doing anything. It simply granted a use in common of the Community Land and Community Lot. It is an express easement as discussed, *infra.*

. . .

"The original grantors of The Pines were the Turners. The Severn River Co. was an entity of which Mr. Turner was president. The deed created by the Turners that

conveyed The Pines to the company of which Leon[id]as was the president, and the plats accompanying that conveyance, clearly establish a waterfront community. Both plats show Community Land and Community Lot. The deed to the Severn River Co. clearly grants all the Community Land and Community Lot, together with riparian rights, 'piers and appurtenances and advantages to the same belonging or in anywise appertaining. . . .' Whereas the deeds to individual lot owners provided them use in common of roads and the 'Community Lot on said Plat and all water and riparian rights incident thereto.' "

"Thus, the deeds granted the use in common of riparian rights. We hold that those terms are clear and unambiguous. The deeds establishing easements for the lot owners' use of the Community Land in The Pines and their riparian rights are in common with others, not separate and exclusive."

*White,* 173 Md.App. at 39–44, 917 A.2d at 1144–46. We agree with the Court of Special Appeals' reasoning, finding that PCIA is the owner of the community property, and that the community property is subject to a common easement that allows PCIA and all of the individual lot owners a right to use the community property in common with each other.

As the PCIA is the owner of the community property, it follows therefore, that it also normally would be the owners of the piers attached to that community property. Maryland Code (1982, 2007 Repl.Vol.), § 16–201 of the Environment Article states, in relevant part:

"[A] person may make improvements into the water in front of the land to preserve that person's access to the navigable water or protect the shore of that person against erosion. *After an improvement has been constructed, the improvement is the property of the owner of the land to which the improvement is attached."* (Emphasis added.)

With regard to the case at bar, the Court of Special Appeals went on to hold:

"The grant of riparian rights to appellants in the deeds are express and interpretation is, thus, controlled by the language of the deed.... No extrinsic evidence is required to interpret its meaning. The piers built by appellants' predecessors in interest became the property of the riparian owner.... The grant of riparian rights to the lot owners does not equate to the ownership of riparian land."

*White v. Pines Community Improvement Ass'n,* 173 Md.App. at 45, 917 A.2d at 1147.

■ As PCIA was the actual owner of the waterfront property, subject to an easement allowing all individual lot owners to exercise riparian rights in common with each other, there exists a presumption that the permissive use of the real property in common with all members of the community normally cannot ripen into a prescriptive easement. *Kirby v. Hook,* 347 Md. 380, 393, 701 A.2d 397, 404 (1997) (citing *Phillips v. Phillips,* 215 Md. 28, 33, 135 A.2d 849, 851 (1957)).

### Ouster

The Court of Special Appeals did not reject the principle that an ouster could change the use from permissive to adverse, as implied by petitioner A in their first question. That Court simply did not address the issue of ouster because it found that a co-tenancy had not been established. We disagree, in part, with the reasoning of the Court of Special Appeals on this issue.

■ Co-tenancy is not required for an ouster to exist. *See Potomac Lodge No. 31, I.O.O.F. v. Miller,* 118 Md. 405, 415–16, 84 A. 554, 558 (1912) (citing 1 Am. & Eng. Ency. of Law, 804.) (" 'The ouster by a tenant in common, of his co-tenant, does not differ in its nature from any other ouster, nor in any respect except in the degree of evidence required.' ") In cases where no co-tenancy exists, however, the criterion required for the showing of ouster is unclear. We are offered one definition in the case of *James Stewart's Lessee v. Robert Jones, of George,* 8 G. & J. 1, 17 (Md.1836), where the Court stated, in relevant part: "An ouster, is some act adverse to the posses-

sion of another excluding him...." In delineating the type of act that would be adverse to the possession of another, we have stated: "[W]here '[t]he real and vital purpose sought to be accomplished by [the action] is the ousting of the tenant,' the action is one at law." *Martin v. Howard County*, 349 Md. 469, 489, 709 A.2d 125, 135 (1998) (quoting *Redwood Hotel v. Korbien*, 195 Md. 402, 411, 73 A.2d 468, 471 (1950)). Further, ousting must be an overt act that is a hostile invasion of another's rights. *Jurgensen v. New Phoenix Atlantic Condominium Council of Unit Owners*, 380 Md. 106, 124 n. 8, 843 A.2d 865, 875 n. 8 (2004). *See Beatty v. Mason*, 30 Md. 409, 410 (1869) ("A survey, unaccompanied by any other act of user and occupation, is not such a distinct and notorious act of possession as will justify the reasonable presumption of an ouster, or that the party went upon the land with a palpable intent to claim the possession as his own."). *Accord Rosencrantz v. Shields, Inc.*, 28 Md.App. 379, 393, 346 A.2d 237, 245 (1975). "And while the ouster need not have been accompanied by positive force, it must have been actual, and be established by acts or declarations brought home to the knowledge of the cotenant." *Ross v. Phillips*, 148 Md. 165, 167, 129 A. 21, 22 (1925). *Accord Bratton v. Hitchens*, 43 Md.App. 348, 356, 405 A.2d 333, 338 (1979).

In the context of co-tenancy, the Court of Special Appeals has defined ouster as: "a notorious and unequivocal act by which one cotenant deprives another of the right to the common and equal possession and enjoyment of the property." *Young v. Young*, 37 Md.App. 211, 221, 376 A.2d 1151, 1158 (1977). And this Court has stated " 'and any act or conduct signifying his intention to hold, occupy and enjoy the premises exclusively, and of which the tenant out of possession has knowledge, or of which he has sufficient information to put him upon inquiry, amounts to an ouster of such [a co-]tenant.' " *Sowers v. Keedy*, 135 Md. 448, 451, 109 A. 143, 144 (1919) (citing 1st R.C.L., page 742, paragraph 62). Where no cotenancy exists, however, the burden is less, because there exists no presumption that possession by one is possession by all.

"It is not the law that there can be no adverse possession by one tenant in common against another, but *more evidence is required.* 'The ouster by a tenant in common, of his co-tenant, does not differ in its nature from any other ouster, nor in any respect *except in the degree of evidence required.* The distinction relates to the character of the evidence necessary to prove that the possession was adverse.'" (Emphasis added.)

*Potomac Lodge No. 31, I.O.O.F.*, 118 Md. at 415–16, 84 A. at 558 (quoting 1 *Am. & Eng. Ency. of Law*, 804).

In the instant case, there may well be sufficient evidence in the case of one petitioner to prove that ouster occurred; the Simmons' had erected a "No Trespassing" sign and had written to the PCIA stating that the land and pier were their property. We need not, however, resolve that issue or the other ousting issues because even if ouster could be shown, there was sufficient factual evidence before the trial court in each relevant case for it to find that adverse possession after ouster could not be proved for various reasons.

This Court has held that: "To establish title by adverse possession, the claimant must show possession of the claimed property for the statutory period of 20 years. : . . Such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted." *Costello v. Staubitz*, 300 Md. 60, 67, 475 A.2d 1185, 1188 (1984) citing *East Washington Railway Co. v. Brooke*, 244 Md. 287, 294, 223 A.2d 599, 603–04 (1966). Maryland Code (1973, 2002 Repl.Vol.), § 5–103 of the Courts and Judicial Proceedings Article states, in relevant part:

"§ 5–103. **Adverse possessions; common-law doctrine of prescription and other limitations unaffected.**

(a) *In general.*—Within 20 years from the date the cause of action accrues, a person shall:

(1) File an action for recovery of possession of a corporeal freehold or leasehold estate in land; or

(2) *Enter on the land.*

(b) *Exceptions.*—(1) This section does not affect the common-law doctrine of prescription as it applies to the creation of incorporeal interests in land by adverse use." (Emphasis added.)

 We restate the facts as articulated by Judge Davis for the Court of Special Appeals that support the decision by the trial court in respect to adverse possession demonstrating how a claim of adverse possession would fail as to the respective petitioners:

### "Pier 2—Donahue

"Because Pier 2 has existed since the 1930's and has been maintained by the owners of lot 309 as exclusive users of the pier, save for neighbors who have used it with permission, the Donahues posit that they should be granted adverse possession.

"To establish a claim for adverse possession, the statutory time period cannot be interrupted. *See Hungerford [v. Hungerford,* 234 Md. 338, 340, 199 A.2d 209, 210–211 (1964)], *supra.* The Court of Appeals, holding that the statutory time had not been interrupted, opined that

'[a]ll the authorities agree that an entry, to have such effect, must be an actual entry upon some part of the land within the period of limitations, and must evince that it is made with the clear and unequivocal intent to invade and challenge the right of the holder of the adverse possession and to retake possession.'

*Rosencrantz v. Shields, Inc.,* 28 Md.App. 379, 388–89, 346 A.2d 237[242] (1975) (quoting *Wickes v. Wickes,* 98 Md. 307, 328, 56 A. 1017, [1026] (1904)).

"Substantial evidence presented by both parties at trial exists in the record to support the trial court's finding that adverse possession could not have ripened. Appellants presented a letter from Chet Harriman, a president of the PCIA acknowledging Pier 2 as 'your pier' and appellees presented evidence of a letter from its lawyer from 1983 claiming ownership of piers in The Pines. The trial judge found that the Donahues had applied for boating permits

from 1993 to 2003, boats were assigned to Pier 2 and in the years subsequent to 1966[ ] community walks have entered upon Pier 2. Substantial evidence as to adverse possession exists in the record [supporting the trial court's decision] for the court to decide the issue and we find no error of fact or law as to adverse possession.

### "Piers 8 and 9—Simmons and Johnston

"Pier 8 and Pier 9 are claimed by appellants through color of title and appellants contend that the PCIA, more-over, has acknowledged their ownership as late as 1998 when, in its newsletter, it stated that 'the shoreline from the west end of the community beach to the south end of The Terraces is privately owned. Access to the water and private piers in this area is by invitation only.' Further, the property in front of Pier 9 was backfilled and a 1974 confirmatory deed was filed putting on public record the claim that all the property in front of lot 401 and part of lot 402 belonged to the lot owner. The property was adver-tised for sale as riparian property. Johnston claims no PCIA member ever tried to come onto the contended prop-erty when he was there, no Pines logos were painted on Pier 9 and no one from the PCIA ever tried to evict him.

"The Simmons' bought their lot from Frederick Green (hereinafter Green). The deeds conveyed the lots that the Simmons' bought to the water's edge. Green established a bulkhead, backfilled washed out land, maintained Pier 8, erected a fence and, as early as 1975, Simmons erected a 'No Trespassing' sign and wrote to the PCIA stating that the land and pier were his property. The Simmons person-ally insure Pier 8 as part of their homeowner's policy and, like Johnston, the Simmons' property is taxed as waterfront. Payment of taxes is a salient fact in support of, but alone not sufficient to prove, adverse possession. *Bratton v. Hitchens,* 43 Md.App. 348, 358, 405 A.2d 333[, 339] (1979).

"The court had substantial evidence from which to make its decision. The record is replete with testimony and evidence in support of both parties' contentions. We do not find that the trial court abused its discretion by not consid-

ering Simmons' testimony because there is no evidence to that effect and we presume the trial judge carefully considered all of the arguments before making a decision. *Thomas [v. City of Annapolis]*, 113 Md.App. [440,] 450, 688 A.2d 448 [, 453 (1997)]. Likewise, appellant cites no law to support the contention that building a bulkhead and backfilling the land amounts to erasing the Community Land and, further, one cannot adversely possess one's own land as the Simmons' assert the land between their lots and Chase Creek became. Alternatively, the record reflects that some Community Land remained after the bulkhead was erected and backfilled. The PCIA conducted community walks on the Community Land in front of the Simmons' lot. The trial judge's ruling was not clearly erroneous that the reentry was enough to assert ownership by the PCIA.

"The trial court found that [Johnston's predecessor in title] failed to respond to the 1983 letter from the PCIA that it owned Pier 9 and, in 1985, wrote the PCIA in regard to Pier 9 following a community walk. They acknowledged a dispute as to ownership of Pier 9, but that was less than twenty years ago and hardly hostile possession as they asked to discuss a resolution of various claims to the property and settlement. *See Hungerford, supra.* Thus, as Johnston's predecessor did not claim adverse possession or prescriptive easement, title cannot be tacked which Johnston must do in order to reach the statutory period.[15] The PCIA continued to enter the property and painted a logo on Pier 9 in 1990.

. . .

## "Pier 11—Clow

"Predecessor owners, the Elgerts, did not respond to the assertation of ownership contained in the 1983 letter from

---

**15.** We neither agree, nor necessarily disagree, with the Court of Special Appeals' statement that a predecessor in proper possession must make some active declaration that his possession of property is adverse in order for "tacking" to apply in an adverse possession context. In the context of this case, we need not address this issue further.

the PCIA. The trial court found that the PCIA routinely assigns slips on Pier 11. Clow argues that she approached the PCIA about extending Pier 11 because without PCIA's consent, as deeded owner of the land, she thought a permit would not be issued. We find no error of fact or law as it relates to the trial court's ruling in regard to Pier 11. There was no mistake on Clow's part as to ownership of the riparian land and no exercise of actual, open, notorious, exclusive, hostile, under claim of title or ownership for the statutory period. *Costello [v. Staubitz]*, 300 Md. [60,][ ] 67, 475 A.2d 1185[, 1188 (1984)].

### "Pier 12—White

"The Whites' lots 608 and 609 were part of the original 1922 plat and the 1943 litigation between Kipp and Lenzer. Notwithstanding that Lenzer's 1941 letter provided, in notorious and hostile fashion, his claim to pier 12, it was not directed at the title owners of the Community Land and Community Lot to which the pier attached as discussed *supra*. Further, the litigation addressed the fence constructed by Lenzer and not the pier.

"The court in *Kipp v. Lenzer* [16] ruled that it was

'not asked to require the defendants to remove so much of the pier as extends out over the water. In any event, it is difficult to understand how the Court, on the present state of the record, could do anything about that. The *Plaintiffs do not own the Beach but have only an easement therein in virtue of their ownership of lots in the development.* They have no more right to the use of the water in front of the beach than any other member of the general public has; and, in the absence of a showing that they have suffered a special damage, that is to say, a damage different from that suffered by the general public, by reason of the maintenance of so much of the pier as

---

16. That case was heard in October 1943, in the Circuit Court for Anne Arundel County, In Equity, Case No. 8401 Equity, found in the record extract at E. 1500.

extends out over the water, they are certainly not entitled to injunctive relief as to that part of the pier which extends out over the water.'

*　　*　　*

'The Court will, accordingly, confine its discussion to the steps leading down the bluff and the boardwalk leading from the foot of the steps out to the water's edge.' (Emphasis added.)

"The *Kipp* Court further found that it could not 'see any possible objection to the maintenance of the steps' because the bluff could be used for no other purpose than access from lot 609 to the beach. No other lot holder or Kipp could 'be hurt by the maintenance of those steps' and although it was possible, though the court did not find an invasion of technical rights; it was not an invasion of practicable rights such that an equity court would interfere. The topography of the land was the issue as to access to the beach, not the steps. The lot owners were precluded from obstructing passage along the community beach.

"Notwithstanding that ruling, appellants contend that Lenzer's successor Price held Pier 12 exclusively and even told the PCIA to 'go fly a kite' when the PCIA demanded dock rental fees for use of Pier 12. The police were called to evict trespassers and the Whites believed Pier 12 came with their house.

"To support their claim of tacking, the Whites' rely on the deeds in their chain of title as having conveyed Pier 12 to them. A review of the deed reveals that the deed from the Whites' immediate predecessor states a conveyance of lots 608 and 609 'TOGETHER with all improvements thereon and the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging or in anywise appertaining.' The immediately subsequent paragraph states that the grant is 'SUBJECT to the covenants, conditions, easements and restrictions of record and amendments thereto,' making the appurtenance of the pier that the Whites and their predecessors claim subject to the common

scheme provided for in the plats and the permissive easements granted in the deeds.

"Testimony at trial indicated that the 'No Trespassing' signs posted by the Whites and their predecessors were taken down by the PCIA and that the PCIA's signs were replaced with private signs. The Whites argue that no Community Lot or Community Land exists, the PCIA has never moored nor assigned a boat at Pier 12, executed any leases with respect to Pier 12 and the Whites have paid the taxes assessed for the pier.

"Contrary testimony indicated an absence of no trespassing signs on Pier 12 and that the advertised community walks that occurred with regularity beginning in the mid-1960's and extending to the present time, constituted a reentry on the land for purposes of indicating that appellants' possession was invalid. *Rosencrantz*, 28 Md.App. at 389, 346 A.2d [at] 237. The variance applied for by the Whites in 2001 indicates that there is indeed a strip of community land that appellants acknowledged.

"Substantial and conflicting evidence in the record presented by both parties was found by the trial court to militate in favor of the PCIA and we find no clear error of law or fact in which to ground a reversal.

### "Pier 13—Garman

"In previous litigation, the court ruled that, 'even though the Garmans may have rebuilt the pier as a result of its destruction by ice during the winter of 1976–1977, it shall remain the property of the riparian owner.' The court named the PCIA as riparian owner and, thus, appellees claim that that ruling precludes appellants' claim as to ownership under *res judicata*. We disagree. A ruling as to ownership of the pier does not preclude the beginning of a new statutory period if the elements of adverse possession are met. The moment adverse possession is interrupted another period may begin *de novo*. *Hughes v. Insley*, 155 Md.App. 608, 622, 845 A.2d 1[, 9] (2003).

"Appellants aver that notwithstanding the ruling of the Circuit Court for Anne Arundel County in favor of the PCIA in 1982, the Garmans nevertheless continued to possess Pier 13 to the exclusion of all others and, thus, meet the statutory requirements for adverse possession. PCIA letters requesting compliance with the court order were ignored and assigned boats' owners were told by Mr. Garman that he was the 'dockmaster.' Substantial evidence exists in the record that Mr. Garman was not claiming exclusive use of Pier 13 and, in any event, the PCIA exerted control over the pier by assigning boats, sending correspondence and conducting community walks thereby interrupting any twenty year period begun after the 1982 decision and we do not find clear error on the part of the trial court.

. . .

### "14B, 15 and 16—Gill & Assocs.

"The trial court was not clearly erroneous in finding that appellants did not acquire title to the above referenced piers by adverse possession because substantial evidence exists in the record for the trial court to have so found from the following evidence in the record.

### "14B

"Pier 14B was constructed some time before 1943. The trial court found that Pier 14B can hardly qualify as a pier because it was dismantled in the late 1970's. That action by the PCIA was the impetus for the suit filed by Wirt Gill and later dismissed without prejudice. Testimony exists in the record from Nichols [17] that the pier is in use.

### "15

"The finding of the Anne Arundel Circuit Court, which was not appealed, granted ownership of Pier 15 to the PCIA

---

17. Nichols was an appellant in the case before the Court of Special Appeals, but is not a party to this appeal.

in 1987. A claim of adverse possession would have had to begin again and, thus, we perceive no clear error of the trial court's factual finding that adverse possession did not accrue and Pier 15 belongs to the PCIA.

"16

"Appellants contend that, because the pier was constructed and solely maintained by the [ ] previous owner and the general reputation was that the pier belonged to the owners of lot 624, that they have acquired title to Pier 16 by adverse possession. The PCIA added additional pilings and the record indicates that Nichols was unable to get a permit to repair it because of the PCIA's ownership of the pier." *White*, 173 Md.App. at 49–59, 917 A.2d at 1150–1155 (2007).

While the findings of fact of the trial court are somewhat confusing, and, to some extent, unusual, we see no sufficient error of fact or law in the relating of those findings by the Court of Special Appeals. In other words, while there is evidence to the contrary, there is sufficient evidence (albeit barely in some cases) in the record to support the trial court's findings on the issues next above discussed. "The weighing of the evidence and the assessment of witness credibility is for the finder of fact, not the reviewing court. *Terranova v. Board of Trustees*, 81 Md.App. 1, 13, 566 A.2d 497, 503 (1989).

The Court of Special Appeals, after further describing the trial court's findings, correctly went on to hold that where there is an agreement that violates the law, that agreement is unenforceable in Maryland. *See e.g., State Farm Mut. Automobile Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 643, 516 A.2d 586, 592 (1986). With respect to the instant case, the Court of Special appeals stated: "[T]he [trial] judge noted that attempts by the PCIA to control piers violates the R–2 zoning of the area because community piers and marinas are not permitted uses except in the area adjacent to the Community Beach [i.e. the Community Land]." *White*, 173 Md.App. at 62, 917 A.2d at 1157. By its own admission, the trial court then established a system that would be unenforceable in Maryland

if its finding that such action would violate zoning provisions is correct.

■■■ Enforceability of this agreement, however, may be a moot issue, as we are unable to find in the record where PCIA was ever granted the authority to manage the piers. As a lot owner itself, PCIA is both a servient tenement and a dominant tenement. In other words, it has both the right to use, in common with other lot owners, the community property as a lot owner, and as the owner of the community property, it is subject to the other lot owners' rights to use the community property. We have been unable to find, however, any conveyance that grants PCIA the authority to exclude any lot owner or to charge any fee for the use of the piers. Further, we find no error of law in the Court of Special Appeals' analysis of this issue. That Court stated, in relevant part:

> "A servient tenement cannot close or obstruct an easement so as to prevent the reasonable enjoyment of those entitled to use it. *Maddran v. Mullendore*, 206 Md. 291, 297, 111 A.2d 608[, 610] (1955). Similarly, the PCIA may not control the piers to exclude those who have an express grant of riparian rights nor can appellants prevent the PCIA's use in common in its role as lot owner and servient tenement.

> "Appellants argue that if not created by an express provision, the PCIA's only basis for collecting fees then, can be that there is 'an implied obligation to *contribute to the maintenance* of commonly held property without regard to usage.' Restatement (Third) of Property, Servitudes, § 6.2 (2000) (emphasis added by appellant). We agree. The fact that those sharing a common easement may be responsible for its maintenance does not make the several landowners a common-interest community because their duty is determined by the extent of their use. *Id.*

> . . .

> "The PICA's right to require reasonable maintenance fees comes from a shared right of use in the easement and not

from its status as a community association or by a covenant in lot owners' deeds." [18]

*White,* 173 Md.App. at 67–68, 917 A.2d at 1160. We further agree with the Court of Special Appeals that the past wet storage fees assessed against all the petitioners appear to be inappropriate, even if a statute or the common law permits. The record, however, does not reflect that such issue has been addressed sufficiently below, and as stated above, we have found no conveyance that expressly grants PCIA such power. Accordingly, we leave the possibility of proportionately distributing the future wet storage fees to further negotiation, settlement or litigation.

## IV. Conclusion

For the foregoing reasons, we affirm, generally, the Court of Special Appeals, with the reservation next above stated, which presumably may be subject to further negotiation, settlement or litigation, and hold that the PCIA is the owner of the community property, i.e., Community Land and Community Lot, and as a result of that ownership, is also the owner of the facilities, i.e., the piers at issue in this appeal, extending channelward from the Community Land and Community Lot. That ownership is subject to an express common easement to all property owners in the community (unless other title instruments provide otherwise) as to riparian rights, which would include PCIA. Finally, the wet storage fees assessed by the trial court were inappropriate, as was the maintenance system established by the trial court.

---

**18.** We do not agree necessarily with that final statement. As we noted earlier, the record reflects that membership in PCIA is voluntary. Where PCIA is not permitted by statute to operate a marina outside of the Community Lot, and where membership in PCIA is voluntary, it may be difficult to set up a system for contribution for the maintenance of the piers or even a system for use of the piers. We note that just because an owner may have riparian rights does not mean that he must exercise them just because someone else who shares riparian rights is using them and that in such a circumstance he must pay to maintain a pier over which he does not exercise the rights he may have *unless the covenants affecting the land generally, or the instruments in his chain of title so provide.*

THE JUDGMENT OF THE COURT OF SPECIAL AP-
PEALS IS AFFIRMED IN PART AND VACATED IN
PART; COSTS IN THIS COURT AND THE COURT OF
SPECIAL APPEALS TO BE PAID EQUALLY BY PETI-
TIONERS.